ACADIA MOTORS, INC.,
et al., Plaintiffs,

v.

FORD MOTOR COMPANY, Defendant.

Civ. No. 93–0136–B.

United States District Court,
D. Maine.

Feb. 15, 1994.

Peter L. Murray, Murray, Plumb & Murray, Michael Kaplan, Preti, Flaherty, Beliveau & Pachios, Portland, ME, Bruce C. Gerrity, Preti, Flaherty, Beliveau & Pachios, Augusta, ME, for plaintiffs.

Carl E. Kandutsch, Verrill & Dana, Portland, ME, Hilde E. Kahn, Arnold & Porter, Washington, DC, for defendant.

Francis E. Ackerman, Asst. Atty. Gen., Augusta, ME, for State of ME.

## ORDER AND MEMORANDUM OF DECISION

BRODY, District Judge.

Plaintiffs, thirty-two Maine automobile dealers, bring the instant action against Ford Motor Company protesting Ford's warranty reimbursement practices. Ford moves to Dismiss the Complaint, or, in the alternative, for Summary Judgment. The Dealers move for Partial Summary Judgment.

### I. Background

Plaintiffs have entered into franchise agreements with Ford that obligate them to perform warranty work on Ford's behalf, generally without charge to the new motor vehicle owner. Ford then reimburses the dealers for parts and labor thus provided. Ford has a uniform national reimbursement formula under which Ford pays its dealers 30% above dealer list price for parts for 1992 models and earlier, 35% for 1993 models, and 40% for 1994 models. (Letter from Suhay to Bob Chambers Ford of 3/25/93.) Prior to the

events leading to this litigation, Ford reimbursed its dealers according to this uniform policy.

From 1975 to 1991, Maine law required manufacturers to "adequately and fairly compensate ... (its motor vehicle dealers) for ... parts" provided in warranty work. Regulation of Business Practices Between Motor Vehicle Manufacturers, Distributors and Dealers, Me.Pub.L.1975, ch. 573 (codified as amended in 10 M.R.S.A. § 1176 (1980 & Supp.1993)). In 1991, however, the Legislature amended § 1176 to require manufacturers to reimburse dealers at each dealer's customary charge for the same part when the dealer performs nonwarranty work.[1] Despite this change in statutory reimbursement requirements, Ford continued to reimburse Maine dealers according to its uniform national policy. Ford concedes that its national reimbursement level is generally less than the retail rate customarily charged by most dealers.

Shortly after the amendment of § 1176, one Maine dealer sent Ford a letter demanding reimbursement at the new statutory rate. Another dealer brought suit in Penobscot County Small Claims Court for reimbursement under § 1176. Although the action was dismissed for the dealer's failure to make a proper claim, Ford decided to change its reimbursement policies. Ford informed its Maine dealers that:

> As a result of this dealer's demand, all Maine dealers will be reimbursed for parts utilized on Ford-paid repairs performed after April 1, 1993 at the rate of cost plus 63%, which is the average warranty parts markup reflected in the suggested list prices.

(Letter Ross H. Roberts et al. to Bob Chambers Ford 2/12/93.)

In the same letter Ford stated its intention to recoup its increased costs of warranty reimbursement:

> To recover·this increase in warranty costs, we will increase the wholesale price of each new vehicle sold by your dealership, and every other Ford ... dealership in Maine, through assessment of a warranty surcharge of approximately $160 per vehicle [which] will appear on your monthly Dealer's Parts Statement in the month following the sale.

*Id.* Ford later referred to this charge as a "warranty parity surcharge."

The gravamen of the Dealers' complaint is their claim that Ford's reimbursement policy, especially its $160 surcharge, is in direct contravention of § 1176. The Dealers also claim that Ford's intentional noncompliance with § 1176 constitutes, first, an unfair method of competition and deceptive trade practice under 10 M.R.S.A. § 1174; and, second, a "failure ... to act in good faith in performing or complying with any of the terms or provisions of the franchise agreement" actionable under the Automobile Dealers' Day in Court Act, 15 U.S.C. § 1221–25. Finally, the Dealers argue that, even if the warranty surcharge were in conformity with § 1176, it is discriminatory pricing under the Robinson–Patman Act, specifically, 15 U.S.C. § 13(a), and under Maine law, 10 M.R.S.A. § 1174(3)(E)–(F).[2]

## II. Standard

Ford moves, pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss the Complaint for failure to state a claim upon which relief may be granted. In the alternative, Ford moves for summary judgment on all counts, pursuant to Fed.R.Civ.P. 56 and Rule 19 of the Local Rules. Because Ford files a Statement of Material Facts, the Court treats Ford's Motion to Dismiss as a Motion for Summary Judgment. *See* Fed.R.Civ.P. 12(b) ("If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, mat-

---

1. 10 M.R.S.A. § 1176 (Supp.1993) provides in relevant part:
 [T]he franchisor ... shall reimburse the franchisee for any parts [provided for warranty work] at the retail rate customarily charged by that franchisee for the same parts when not provided in satisfaction of a warranty.

2. The Dealers also brought a claim under 10 M.R.S.A. § 1181 but voluntarily withdrew this claim. *See* Pls.' Mem.Op.Def.'s Mot. for S.J. at 48 n. 19.

ters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment.") The Dealers move for Partial Summary Judgment on Count II of their complaint.

"Summary judgment is appropriate where the record, viewed in the light most favorable to the nonmoving party, reveals no trialworthy issue of material fact and the moving party is entitled to judgment as a matter of law." *Velez–Gomez v. SMA Life Assurance Co.*, 8 F.3d 873, 875 (1st Cir.1993).

### III. Maine's Warranty Reimbursement Law 10 M.R.S.A. § 1176 (Supp.1993)

The Court first addresses whether Ford's reimbursement policies comply with § 1176. Ford asserts that, before reaching the question of compliance, however, the Court must consider the validity of § 1176 as applied in this case.

Ford raises a variety of challenges to the statute. Ford contends that the 1991 amendment to § 1176, first, was preempted by the Magnuson–Moss Act; second, is in violation of the Sherman Act; and third, should not be applied to contracts entered into before its effective date. Finally, Ford contends that, if the statute is valid and applies to preexisting contracts, it violates the contract clause of both the United States and the Maine Constitutions.

#### A. Validity of § 1176

##### 1. Magnuson–Moss Act

Ford contends that § 1176 is preempted by § 107 of the Magnuson–Moss Act, 15 U.S.C. § 2307, that provides:

Nothing in this chapter shall be construed to prevent any warrantor from designating representatives to perform duties under the written or implied warranty: *Provided, That such warrantor shall make reasonable arrangements for compensation of such designated representatives*, but no such designation shall relieve the warrantor of his direct responsibilities to the consumer or make the representative a cowarrantor.

*Id.* (some emphasis added).

■ "Congress can preempt state law expressly 'by so stating in explicit terms on the face of the statute.'" *Motor Vehicle Mfrs. Ass'n v. Abrams*, 899 F.2d 1315, 1318 (2d Cir.1990), *cert. denied*, 499 U.S. 912, 111 S.Ct. 1122, 113 L.Ed.2d 230 (1991) (quoting *Environmental Encapsulating Corp. v. City of New York*, 855 F.2d 48, 53 (2d Cir.1988)). Ford does not contend that § 1176 has been expressly preempted.

Congress may also preempt state law, without such an express statement in two instances: first, when Congress "intends that federal law occupy a given field;" and second, when state law "actually conflicts with federal law, that is, when compliance with both state and federal law is impossible or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *California v. ARC America Corp.*, 490 U.S. 93, 100, 109 S.Ct. 1661, 1665, 104 L.Ed.2d 86 (1989) (internal quotation and citations omitted).

■ In this case, Ford must also overcome the "presumption against finding preemption of state law in areas traditionally regulated by the States." *Id.* at 101, 109 S.Ct. at 1665. "When Congress legislates in a field traditionally occupied by the States, '[the Court] start[s] with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). "[C]onsumer protection through warranty law is an area of traditional state regulation." *Motor Vehicle Mfrs. Ass'n v. Abrams*, 899 F.2d at 1319. Ford, therefore, is required to show that preemption was the clear and manifest purpose of Congress. Ford has not met this burden.

■ Congress did not intend to occupy the field of warranty law when it enacted the Magnuson–Moss Act. In fact, Congress described the standards it established in the

Magnuson–Moss Act as *minimum* requirements. *See* H.Rep. No. 93–1107, 1974 U.S.C.A.A.N. 7702, 7702 (purpose of Act "to provide minimum disclosure standards for written consumer product warranties ...; [and] to define minimum Federal content standards for such warranties.") Congress also expressly allowed for stricter state regulation of warranties. *See* 15 U.S.C. § 2311(b)(1).

Ford has also failed to establish that § 1176 actually conflicts with federal law. Ford cites *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977), for the proposition that flexible federal laws cannot be usurped by stricter state laws, but *Jones* is easily distinguished from the case at bar. In *Jones*, the Supreme Court found that it was Congress's intent to allow reasonable variations from the food weight stated on the label, and that state food labelling requirements not permitting this variation would conflict with that goal. *Id.* at 542–43, 97 S.Ct. at 1318. Unlike the state law in *Jones*, § 1176 does not thwart the purposes and objectives of Congress in enacting § 107 of the Magnuson–Moss Act. Ford, therefore, has not overcome the presumption against finding a preemption of § 1176.

### 2. *The Sherman Act*

■ Ford asserts that 10 M.R.S.A. § 1176 conflicts with the Sherman Act, 15 U.S.C. § 1, because it authorizes or compels private parties to engage in anticompetitive behavior.

The Court rejects this argument. Section 1176 requires manufacturers to reimburse their dealers for parts at the retail rate customarily charged by each dealer for the same part when provided for nonwarranty work. The result is not anticompetitive. Instead, § 1176 simply ensures that manufacturers pay market price when they would

otherwise be sheltered from the market because of "[t]he disparity in bargaining power between automobile manufacturers and their dealers." *New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 439 U.S. 96, 100, 99 S.Ct. 403, 407, 58 L.Ed.2d 361 (1978). It is the market and not the state, therefore, that establishes the price paid by Ford for parts.[3]

■ Even if § 1176 were considered anticompetitive, the Supreme Court, in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), held that "the Sherman Act does not apply 'to the anticompetitive conduct of a State acting through its legislature.'" *324 Liquor Corp. v. Duffy*, 479 U.S. 335, 343, 107 S.Ct. 720, 725, 93 L.Ed.2d 667 (1987) (quoting *Hallie v. Eau Claire*, 471 U.S. 34, 38, 105 S.Ct. 1713, 1716, 85 L.Ed.2d 24 (1985)). In order to qualify for this state exemption from the Sherman Act, the state's conduct must meet two criteria. *324 Liquor*, 479 U.S. at 343, 107 S.Ct. at 725. "First, the challenged restraint must be one clearly articulated and affirmatively expressed as state policy." *Id.* (internal quotations and citations omitted). Second, the policy must be "actively supervised by the State itself." *Id.* Section 1176 satisfies both criteria and therefore would not violate the Sherman Act even if it authorized anticompetitive behavior.

### 3. *Contract Clause*

#### a. *Does 10 M.R.S.A. § 1176 Apply to Pre–1991 Contracts?*

Thirty-one of the thirty-two Plaintiffs entered into franchise agreements with Ford prior to the effective date of the 1991 amendments. Ford asserts that the amendments do not apply to the thirty-one preexisting contracts. The Court disagrees.

The Maine Legislature did not expressly provide that § 1176 would apply to contracts entered into prior to its 1991 amendments.[4]

---

3. In fact, Ford itself characterized the retail prices charged by dealers as *"dependent upon competitive forces* influenced in part by the availability of alternative parts suppliers (such as independent automobile parts stores)." (Ford Mem.Supp.Mot. to Dismiss at 5 (emphasis added).)

4. In other areas, the Legislature has clearly stated its intention to have statutory provisions apply

to preexisting contracts. For example, Maine's regulations governing Malt Liquor and Wine Wholesale Licensing provides "[t]he provisions of this chapter apply to agreements between certificate of approval holders and wholesale licensees in existence on September 16, 1979, and those entered into after that date." 28–A M.R.S.A. § 1464 (1988).

The scope of the Regulations is described in 10 M.R.S.A. § 1178 (1980 & Supp.1993). Section 1178 provides that:

1. Agreements subject to this chapter. Written or oral agreements between a manufacturer ... [and] a motor vehicle dealer, including, but not limited to, the franchise offering, the franchise agreement, sales of goods, ... and all other such agreements in which the manufacturer ... has any direct or indirect interest, shall be subject to this chapter.

10 M.R.S.A. § 1178(1) (1980).[5]

■ Although the Legislature did not explicitly require the Court to apply § 1176 to preexisting contracts, the Court is satisfied, after reviewing the legislative intent behind the Regulations, that § 1176 should be so applied. *See Mahaney v. State,* 610 A.2d 738, 741 (Me.1992) ("The intent and object of the Legislature in enacting the law are to be ascertained and given effect, if the language be fairly susceptible of such a construction" and "[the Court should adopt] [s]uch interpretation of the words ... as shall appear most reasonable and best suited to accomplish the objects of the statute").

Maine began regulating the relationship between automobile manufacturers and their dealers in 1975. Although there was little discussion in the Legislature when it enacted § 1176,[6] other legislative bodies have cited the considerable disparity in bargaining power between manufacturers and dealers as reason for intervention in the relationship.[7]

Maine has regulated the price paid by manufacturers to reimburse their dealers for parts and labor provided in warranty work since 1975. Initially Maine law required only that manufacturers "adequately and fairly compensate each of its motor vehicle dealers for labor and parts."

In 1980, when the Legislature amended § 1176 to provide that reimbursement for *labor* be at the customary retail rate, Me. P.L.1979, ch. 698, the Legislature described the impetus behind the amendment:

With their superior bargaining position, automakers have in the past forced dealers to accept reimbursement at a rate substantially lower than the dealers' usual retail rate. The net effect has been that, through an inflated labor rate, non-warranty customers have subsidized automakers who were unwilling to pay the fair and full price for repairs made necessary when their automobiles failed to meet warranty standards. This section prevents the recurrence of this problem....

Me.L.D.1878, 109th Leg., 2d Sess. (Statement of Fact). In 1991, when the Legislature amended § 1176 to require that dealers be compensated for parts at the dealer's customary retail rate, it stated that the purpose of the amendment was to make compensation for parts the same as compensation for

---

5. The Regulations include:

Any contract or part thereof or practice thereunder in violation of any provision of this chapter shall be deemed against public policy and shall be void and unenforceable.

10 M.R.S.A. § 1182 (1980). The First Circuit has held that, under Rhode Island law, which requires "clear, strong language" to give a statute retroactive effect to preexisting contracts, that a Rhode Island provision similar to § 1182 "did not manifest sufficiently, if at all, a legislative intent to give [the statute] retroactive effect to invalidate preexisting contractual rights and obligations." *Scuncio Motors Inc. v. Subaru of New England Inc.,* 715 F.2d 10, 12–13 (1st Cir. 1983). The Court, therefore, does not focus its analysis on § 1182 to find retroactive application.

6. The Statement of Fact for this Act states only, "[t]he purpose of this Act is to regulate business practices between motor vehicle manufacturers, distributors and dealers."

7. Congress has said the following of the relationship between manufacturers and dealers:

[The] vast disparity in economic power and bargaining strength has enabled the [manufacturer] to determine arbitrarily the rules by which the two parties conduct their business affairs. These rules are incorporated in the sales agreement or franchise which the manufacturer has prepared for the dealer's signature.

Dealers are with few exceptions completely dependent on the manufacturer for their supply of cars. When the dealer has invested to the extent required to secure a franchise, he becomes in a real sense the economic captive of his manufacturer.... The faults of the factory-dealer system are directly attributable to the superior market position of the manufacturer.

S.Rep. No. 2073, 84th Cong., 2d Sess., 2 (1956).

labor. Me.L.D. 1235, 115th Leg., 1st Sess. (March 21, 1991) (Statement of Fact).

The Court is satisfied that the Legislature intended manufacturers be required to reimburse dealers for warranty work performed after 1991 according to § 1176 regardless of when the underlying franchise agreement was executed. A contrary conclusion would allow manufacturers to shield themselves from future state regulation altogether simply by entering into contracts with open-ended termination provisions. "[O]ne whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them." *Hudson County Water Co. v. McCarter*, 209 U.S. 349, 357, 28 S.Ct. 529, 531, 52 L.Ed. 828 (1908).

Moreover, "find[ing] that the legislature intended dealership agreements to be covered only by the law in effect when they were executed would create grave problems of enforcement." *N.A. Burkitt, Inc. v. J.I. Case Co.*, 597 F.Supp. 1086, 1088 (D.Me.1984) (concluding that a 1981 amendment to the termination provision of the regulations applied to preexisting franchise agreements). Adopting Ford's interpretation of the statute would require enforcement of four different reimbursement schemes depending on the time the agreement was executed.[8] The Court is persuaded that the Legislature did not intend such a outcome.

### b. *Does § 1176 Violate the Contract Clause?*

Ford asserts that, applying the 1991 amendments to § 1176 to contracts in existence prior to its effective date violates the Contract Clause, U.S. Const., Art. I, § 10, cl. 1;[9] Me.Decl. of Rights, Art. I, § 11.[10] The Court analyzes both the state and federal Contract Clause claims by applying the standard announced in *Energy Reserves Group,*

*Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983). *See N.A. Burkitt*, 597 F.Supp. at 1091 (anticipating that Maine Supreme Judicial Court would adopt *Energy Reserves* standard to analyze state contract clause claims).

■ "Although the language of the Contract Clause is facially absolute, its prohibition must be accommodated to the inherent police power of the State 'to safeguard the vital interests of its people.'" *Energy Reserves*, 459 U.S. at 410, 103 S.Ct. at 704 (quoting *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 434, 54 S.Ct. 231, 238, 78 L.Ed. 413 (1934)). When determining whether a state law violates the Contract Clause, the Court must first determine "'whether the state law has, in fact, operated as a substantial impairment of a contractual relationship.'" *Energy Reserves*, 459 U.S. at 411, 103 S.Ct. at 704 (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244, 98 S.Ct. 2716, 2722, 57 L.Ed.2d 727 (1978)). If the Court determines that the state regulation substantially impairs a contractual relationship, the State, "in justification, must have a significant and legitimate public purpose behind the regulation." *Id.* "The severity of the impairment ... increase[s] the level of scrutiny to which the legislation will be subjected." *Id.* Finally the Court must decide:

> whether the adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption.

*Id.* at 412, 103 S.Ct. at 705 (internal quotations and citations omitted).

#### (1) *Substantial Impairment*

■ "In determining whether the state law has caused a substantial impairment of

---

8. Prior to 1975, Maine did not regulate reimbursement rates for either labor or parts. Between 1975 and 1980, Maine law required that parts and labor to be adequate and fair. Between 1980 and 1991, Maine law required reimbursement to be adequate and fair, but required labor reimbursement to be at the dealer's customary retail rate. After 1991, Maine law required reimbursement for both parts and labor to be at the dealer's customary retail rate.

9. Article I § 10 of the United States Constitution provides: "No State shall ... pass any ... law impairing the Obligation of Contracts."

10. Article I, Section 11 of the Maine Declaration of Rights provides: "The Legislature shall pass no ... law impairing the obligation of contracts...."

Defendant's contractual rights, a major factor to be considered is whether the industry in which the parties are operating is heavily regulated." *N.A. Burkitt*, 597 F.Supp. at 1091. Maine has regulated the relationship between manufacturers and dealers, including warranty reimbursement practices, since 1975. A number of other states also regulate warranty reimbursement practices.[11]

■ Because Maine did not regulate the relationship between dealers and manufacturers before 1975, warranty reimbursement regulations would not have been foreseeable "as the type of law that would alter contract obligations." *Energy Reserves*, 459 U.S. at 416, 103 S.Ct. at 707; *N.A. Burkitt, Inc.*, 597 F.Supp. at 1091. For those contracts entered into before 1975,[12] therefore, the regulation may work a substantial impairment as

to those contracts. After 1975, however, these regulations were not only foreseeable but were already in existence. Therefore, Ford's reasonable expectations, at least as to those contracts entered into after 1975, have not been impaired by § 1176.

### (2) *Significant and Legitimate State Interests*

■ To the extent that § 1176 impairs Ford's interest in its pre–1975 contracts, that section "rests on, and is prompted by, significant and legitimate state interests." *Energy Reserves*, 459 U.S. at 416, 103 S.Ct. at 707. The disparity in bargaining power between automobile manufacturers and their dealers prompted the Maine Legislature to enact legislation to protect dealers from actions by

11. In fact, fourteen other states also now require manufacturers to reimburse their dealers for parts provided in warranty work at the retail rate. They are as follows: Georgia (Ga.Code Ann. § 10–1–641(a)(2) ("in no event shall parts reimbursement paid to the dealer be less than the retail price for such parts")); Kentucky (Ky. Rev.Stat.Ann. § 190.046(2) ("The compensation of a dealer shall not be less than the amount charged by the dealer for like services and parts ... to retail customers for non-warranty service and repairs ... or less than the amounts indicated ... on the schedule filed by the manufacturer with the commission")); Montana (Mont.Code Anno. § 61–4–204(4) ("the manufacturer must compensate an authorized dealer for labor, parts, and other expenses incurred ... at the same rate and time the dealer charges to its retail customers for nonwarranty work of a like kind")); New Hampshire (N.H.Rev.Stat.Ann. ch. 357–C:5(II)(b)) (requires manufacturers reimburse dealers for parts provided in warranty work at the same rate charged by the dealer to the retail customer for non-warranty work of like kind); New Jersey (N.J.Stat. § 56:10–15(a) ("franchisor shall reimburse each motor vehicle franchisee for such services as are rendered and for such parts as are supplied, in an amount equal to the prevailing retail price charged by such motor vehicle franchisee")); New York (N.Y.Veh. & Traf. § 465(1) ("fair and reasonable compensation shall not be less than the price and rate charged by the franchised motor vehicle dealers in the community or marketing area for like services to non-warranty ... customers")); Ohio (Ohio Rev.Code Ann. § 4517.52 ("franchisor shall compensate each of its franchisees for labor and parts used ... at rates not less than the rates charged by the franchisee to its retail customers for like service and parts for nonwarranty work")); Oregon (Or.Rev.Stat. § 650.158) ("Reimbursement for parts ... shall be the amount charged by the dealer to nonwarranty customers")); Rhode Island (R.I.Gen.Laws § 6A–2–329(3)(d)) ("Every manufacturer ... shall be liable to the representative in the amount equal to that which is charged by the representative for like service and repairs rendered to retail consumers")); Texas (Tex.Veh.Code Ann. Art. 4413(36) § 5.02(11)) ("In no event shall any manufacturer or distributor pay its dealers an amount of money for warranty work that is less than that charged by the dealer to the retail customer")); Vermont (9 Vt.Stat.Ann. § 4086(b)) ("Each manufacturer shall compensate each of its dealers for parts used ... at rates charged by the dealer to its retail customers for like parts for nonwarranty work")); Virginia (Va.Code Ann. § 46.2–1571) ("Compensation of a dealer ... shall not be less than the amounts charged by the dealer for the manufacturer's ... parts ... to retail customers")); Washington (46 Rev'd Code of Wash. 46.94.040) ("The compensation shall not be less than the rates reasonably charged by the dealer for like services and parts to retail customers")); and West Virginia (W.Va.Code § 17A–6A–8a) ("In no event shall any manufacturer ... pay its dealers an amount of money for warranty ... work that is less than that charged by the dealer to the retail customers")).

12. A number of franchise agreements between Ford and Plaintiff dealers were entered into before 1975: Acadia Motors (1961); Bob Chambers Fords, Inc. (1972); Bodwell Motors, Inc. (1959); Casco Bay Motors (1963); Dexter Motor Sales (1949); Gray Ford Sales (1970); H.G. Slipp Co., Inc. (1956); Morong–Robinson Automobile Co. (1972); Prouty Ford (1971); Ripley & Fletcher (1957); Rowe Ford Sales (1970); Starkey Ford, Inc. (1963); Weeks–Waltz Motors, Inc. (1932); York Ford Sales, Inc. (1968). (Aff. of Thomas T. Brown, Jr. at 2.)

manufacturers that were perceived as abusive and oppressive. *See* Me.L.D.1878, 109th Leg., 2d Sess. (Statement of Fact). The Legislature specifically wanted to prevent manufacturers, "unwilling to pay the fair and full price for repairs made necessary when their automobiles failed to meet warranty standards," to force dealers to shift costs of performing warranty work to nonwarranty customers. *Id.* The Court finds that the Legislature's concern for protection of dealers and the public is a significant and legitimate public purpose to support § 1176. The means chosen by the Legislature to implement these purposes is also reasonable, "particularly in light of the deference to which the [State] Legislature's judgment is entitled." *Energy Reserves,* 459 U.S. at 418, 103 S.Ct. at 708.

The Court, therefore, finds that applying the 1991 amendment to § 1176 to Ford's contracts with dealers entered into prior to 1991 does not violate the Contract Clause of either the state or federal constitution.

### B. *Did Ford Violate § 1176?*

#### 1. *Did the Dealers Comply with Claims Provisions of § 1176?*

Shortly after the 1991 amendment to § 1176 went into effect in October 1991, Bill Pullen, on behalf of Plaintiff Pullen Ford, wrote to Ford:

> I'm sure that you are aware that the State of Maine enacted a bill that requires Ford Motor Company to pay retail price for parts under warranty. The law went into effect October 7th. We would therefore expect you would abide and credit our account for all warranty parts from the 7th on.

(Pls.' St. of Nat'l Facts Ex. K.) Ford responded to Pullen's letter with an obscure letter stating that it was "necessary" for Pullen Ford to "quantify and substantiate" its request for retail reimbursement by submitting to Ford an "average retail mark-up." (*Id.* at Ex. L.)

Ford asserts that Plaintiffs' claims under § 1176 should be dismissed because Plaintiffs did not submit a particularized claim to Ford

as required by the statute. Ford relies on the language of § 1176 that provides:

> Any claim made by a franchisee for compensation for parts provided or for reimbursement for labor performed in satisfaction of a warranty must be paid within 30 days of its approval. All the claims must be either approved or disapproved within 30 days of their receipt. When any such claim is disapproved, the franchisee that submitted it must be notified in writing of its disapproval within that period, together with the specific reasons for its disapproval.

10 M.R.S.A. § 1176 (Supp.1993). Ford asserts that this language makes the filing of a claim with Ford an express statutory precondition to recovery under the statute.

To the extent that Plaintiffs request "damages for [Ford's] past failures to reimburse the Plaintiff dealers at the statutory rate," the Court is satisfied that Plaintiffs did not make an adequately particularized claim to Ford prior to bringing this action. Ford is entitled to some notice informing it of the pertinent facts regarding the claim that would enable it to determine whether the claim should be approved or denied. The Court does not find persuasive Plaintiffs' response that "[i]t is *not possible* to make a claim for a retail amount under [Ford's computerized] system." (Emphasis in original.) Plaintiffs could have provided Ford a particularized claim in some other form. If Ford then rejected it, Plaintiffs would be able to proceed under the statute. Plaintiffs' Motion for Summary Judgment requesting damages for Ford's past alleged failures to reimburse properly under § 1176 is denied.

■ This does not end the Court's inquiry, however, because Plaintiffs also request that the Court: (1) issue a declaratory judgment declaring that Ford's warranty parity surcharge is illegal under § 1176; (2) issue an injunction prohibiting Ford from continuing to impose this or any other surcharge; (3) order Ford to comply with § 1176 in the future; and (4) order Ford to reimburse them for warranty surcharges already collected by Ford. The Court finds that these claims are cognizable without the submission of a particularized claim to Ford. The lan-

guage of § 1176 does not require a particularized claim be made as a condition precedent to all actions relating to § 1176. There is no question that Ford knew of the Dealers' opposition to Ford's warranty reimbursement practices and, in particular, its warranty parity surcharge but chose not change its policies.

### 2. *Ford's Reimbursement Policy*

Plaintiffs have two objections to Ford's reimbursement practices. First, they contend that Ford's reimbursement at 63% above dealer cost (Ford's suggested list price) is not the same as the retail rate customarily charged by *each* franchisee. Second, Plaintiffs contend that, even if the 63% were "close enough" to each dealer's retail rate, the $160 warranty parity surcharge "strikes at the very heart of Section 1176."

### a. *Is Ford's Rate of Reimbursement Within the Terms of § 1176?*

 The plain language of § 1176 requires that Ford reimburse its dealers "at the retail rate *customarily* charged by *that* franchisee for the *same parts* when not provided in satisfaction of a warranty." 10 M.R.S.A. § 1176 (Supp.1993) (emphasis added). Literally, this requires Ford to pay a dealer the same rate that that particular dealer would have charged for that particular part if the dealer had provided it to a non-warranty customer. Ford's policy of reimbursing dealers at the suggested list price may or may not satisfy § 1176 depending on whether the individual dealer customarily charges more or less than Ford's suggested list price.

As discussed above, the Dealers have not submitted a sufficiently particularized claim to Ford in order to recover for Ford's past alleged underpayments. Moreover, the Dealers have failed to submit enough factual material from which the Court can determine whether Ford's practice of reimbursing dealers at 63% above dealer cost violates § 1176. The Court, therefore, denies Plaintiffs' Motion for Partial Summary Judgment to the extent that they are requesting the Court (1) "find Ford liable for damages for insufficient reimbursement from the effective date of the 1991 Amendment ... to date;" (2) declare Ford's current reimbursement rate illegal; and (3) issue an injunction requiring Ford to reimburse dealers "at the rate required by 10 M.R.S.A. § 1176." It follows that the Court also denies Plaintiffs' request for attorney fees under 10 M.R.S.A. § 1176.

### b. *Does Ford's $160 warranty parity surcharge violate § 1176?*

 Plaintiffs also challenge Ford's attempt to recoup its increased warranty costs by imposing a $160 "warranty parity surcharge." The surcharge did not appear on the dealer's invoice for the automobile or the sticker price listed on the vehicle, but instead appeared on the dealer's monthly *parts* statement in the month following the sale.

Plaintiffs contend that Ford has no right to recover its increased costs of complying with § 1176. The Court disagrees. Ford is entitled to recover its increased costs of doing business in Maine as a result of this legislation. Ford is not entitled, however, to recover its cost in such a way as to thwart the purpose of the legislation. The Court finds that imposing a $160 surcharge for each automobile on the monthly parts invoice issued to the dealer is in direct contravention of the legislative intent and expression found in § 1176, and is, therefore, inappropriate.

In reaching this conclusion, the Court finds New York's so-called "Lemon Law" cases instructive. In 1983, New York enacted its Lemon Law which required manufacturers to provide a warranty for its vehicles for either the vehicle's first two years or 18,000 miles under which it would make repairs "at no charge" to the consumer. *See Abrams v. Ford Motor Co.*, 74 N.Y.2d 495, 549 N.Y.S.2d 368, 371, 548 N.E.2d 906, 909 (1989) (quoting New York's General Business Law § 198–a [b] ). In response to New York's requirement, Ford provided warranty coverage for its vehicles' first two years or 18,000 miles but it charged owners a $100 deductible for each visit covered under the warranty. *Id.* New York's Court of Appeals held that accepting Ford's $100 deductible policy:

> would drain the statute of a central and significant consumer protection, in effect setting the stage to swallow the rule by

allowing automakers to impose other unilateral charges for warranty-covered repairs.

*Id.* After the Court struck down Ford's $100 deductible policy, Ford increased its sticker price for Fords sold in New York by $115 which it identified as "Mandatory N.Y. Repair Coverage." *Motor Vehicle Mfrs. Ass'n v. Abrams,* 684 F.Supp. 804, 805 (S.D.N.Y. 1988). The State of New York "made clear that it is entirely lawful for an automobile manufacturer to impose on its customers a charge resulting from the costs of compliance with the Lemon Law." *Id.* at 806; *see also Motor Vehicle Mfrs. Ass'n v. Abrams,* 720 F.Supp. 284, 291 (S.D.N.Y.1989).

Similarly, if Ford had simply increased the wholesale price of its vehicle and reflected this increased price in its suggested retail price for automobiles sold in Maine, the Court would likely have reached a different conclusion. Ford, however, increased its warranty parts reimbursement to dealers only to recoup these costs directly from dealers on the same parts statement. Ford's actions fly in the face of § 1176.

Ford argues that its only possible opportunity to recoup its increased cost of compliance with Maine law is by increasing the wholesale price of its automobiles. Plaintiffs assert that, if Ford is allowed to recoup its increased costs of complying with § 1176, it should be required to increase its wholesale prices across the country. The Court disagrees. Ford may increase its wholesale automobile prices in Maine without a corresponding increase elsewhere in the country.[13] If Ford chooses to increase its wholesale prices in Maine, however, it must revise its so-called Monroney stickers[14] for automobiles sold in Maine so that the increased price of automobiles is not shouldered only by the dealer, a result contrary to the legislative intent of § 1176.

The Court holds, therefore, that Plaintiffs' Motion for Partial Summary Judgment is granted in part. The Court finds that Ford's warranty parity surcharge, as it is currently structured, is illegal and enjoins Ford from continuing with this practice. The Court denies, however, Plaintiffs' request that the Court issue an injunction preventing Ford from imposing "any other such mechanism" for recouping its costs.

### IV. Discriminatory Pricing

The Dealers assert that Ford should be prohibited from recouping its increased warranty costs in Maine by charging more for the same vehicle in Maine than in other states. They claim that such a price differential would violate the Robinson–Patman Act, 15 U.S.C. § 13(a), and Maine law, 10 M.R.S.A. § 1174(3)(E)–(F).

### A. Robinson–Patman Act

The relevant portion of the Robinson–Patman Act, 15 U.S.C. § 13(a), provides:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, ... where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line or commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly received the benefit of such discrimination, or with customers of either of them....

*Id.* The Dealers argue that Ford dealers in neighboring states, including New Hampshire, are in the same geographical marketing area.[15] They assert that imposing additional costs in Maine but not in neighboring states violates the Robinson–Patman Act.

---

**13.** Subject, of course, to the limitations imposed by the Robinson–Patman Act, discussed below.

**14.** Monroney stickers are required by 15 U.S.C. § 1232. Section 1232 requires that manufacturers affix a label on each new automobile disclosing information including the suggested retail price, the price for each accessory or optional equipment, and any transportation charges.

**15.** The Dealers focus in particular on cars sold to dealers in New Hampshire because New Hampshire also requires warranty reimbursement for parts be at the retail rate. *See* N.H.Rev.Stat.Ann. § 357–C:5(II)(a), (b).

The Robinson–Patman Act provides, however, that price differentials "which make only due allowance for differences in the cost of manufacture, sale or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered" are permissible. *Id.* Therefore, provided that Ford were able to establish that its cost of selling vehicles in Maine were greater than in other states and that the existing price differential were reasonably related to the difference in costs, then Fords pricing would not be in violation of the Robinson–Patman Act.

## B. *10 M.R.S.A. § 1174(3)(E)–(F)*

■■■ The Dealers also assert that Ford's charging more for the same vehicle in Maine than in other states violates 10 M.R.S.A. § 1174(3)(E)–(F). Section 1174(3)(E) makes it unlawful for a manufacturer to "offer to sell or to sell any new motor vehicle at a lower actual price than the actual price offered to any other motor vehicle dealer for the same model vehicle...." Section 1174(3)(F) makes it unlawful to:

offer to sell [or] lease ... any new motor vehicle to any person, except a wholesaler or distributor, at a lower actual price therefor than the actual price offered and charged to a motor vehicle dealer for the same model vehicle similarly equipped or to utilize any device which results in such lesser actual price.

The Court is satisfied that these Maine statutory provisions only address vehicles sold within Maine. Because Ford charges the same price to all Maine dealers, it is not in violation of either § 1174(3)(E) or § 1174(3)(F).

## V. *Plaintiffs' Additional Claims*

Plaintiffs raise a number of additional claims. They claim that Ford's intentional noncompliance with § 1176 constitutes, first, an unfair method of competition and deceptive trade practice under 10 M.R.S.A. § 1174(1).[16]

16. According to 10 M.R.S.A. § 1174(1) it shall be unlawful for any:

Manufacturer ... to engage in any action which is arbitrary, in bad faith or unconsciona-

■■ The First Circuit has interpreted § 1174(1) the terms of the statute:

[B]oth the terms "arbitrary" and "unconscionable" have generally accepted meanings: "arbitrary" has been defined as "selected at random and without reason," and "unconscionable" as shockingly unfair or unjust." ... And although the Maine statute does not define "bad faith," it does provide a definition of "good faith": "honesty in fact and observation of reasonable commercial standards of fair dealing in the trade" as defined and interpreted in § 2–103(1)(b) of U.C.C. A party presumably acts in bad faith when one of these two elements is missing.

*Schott Motorcycle Supply v. American Honda Motor Co.,* 976 F.2d 58, 63 (1st Cir.1992). Under this standard, Plaintiffs have failed to support its contention that Defendant's conduct was arbitrary, in bad faith, or unconscionable. Summary judgment to the Defendant on this claim is, therefore, ordered.

Plaintiffs also claim that Defendant's intentional noncompliance with § 1176 constitutes a "failure ... to act in good faith in performing or complying with any of the terms or provisions of the franchise agreement" actionable under the Automobile Dealers' Day in Court Act, 15 U.S.C. § 1221–25. The Court is not persuaded by Plaintiffs' contention that § 1176 was incorporated into the terms of their franchise agreements for the purposes of the Dealers' Day in Court Act. Because noncompliance with § 1176 does not satisfy the terms of 15 U.S.C. § 1222, summary judgment is also granted to Defendant on this claim.

Plaintiffs also contend that "Ford has used false and misleading advertisements in ... its national advertising in Maine ... without informing Maine customers that they are charged $160 more for their car and warranty than consumers in other states ... in violation of [10 M.R.S.A. §] 1174(3)(D)." The Dealers further assert that Ford's actions "violate[d] public policy within the meaning

ble and which causes damage to any of said parties or to the public.

of 10 M.R.S.A. § 1182." Plaintiffs have not produced any persuasive argument to support these contentions, and therefore summary judgment is granted to Defendant on these unsupported allegations.

*SO ORDERED.*