USCA1 Opinion

 

 February 3, 1995 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 94-1335 ACADIA MOTORS, INC., ET AL., Plaintiffs - Appellees, v. FORD MOTOR COMPANY, Defendant - Appellant. ____________________ No. 94-1450 ACADIA MOTORS, INC., ET AL., Plaintiffs - Appellants, v. FORD MOTOR COMPANY, Defendant - Appellee. ____________________ ERRATA SHEET The opinion of this Court issued on January 24, 1995, is amended as follows: Page 12, first full paragraph, line 4, change "differ" to differs"; Page 19, line 5, delete "to" after "ordered". UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 94-1335 ACADIA MOTORS, INC., ET AL., Plaintiffs - Appellees, v. FORD MOTOR COMPANY, Defendant - Appellant. ____________________ No. 94-1450 ACADIA MOTORS, INC., ET AL., Plaintiffs - Appellants, v. FORD MOTOR COMPANY, Defendant - Appellee. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE [Hon. Morton A. Brody, U.S. District Judge] ___________________ ____________________ Before Torruella, Chief Judge, ___________ Boudin and Stahl, Circuit Judges. ______________ _____________________ Jay Kelly Wright, with whom Hilde E. Kahn, William M. _________________ ______________ ___________ Quinn, Jr., Arnold & Porter, Andrew M. Horton, Carl E. Kandutsch __________ ________________ ________________ _________________ and Verrill & Dana were on brief for Ford Motor Company. ______________ Bruce C. Gerrity, with whom Michael Kaplan, Preti, Flaherty, ________________ ______________ ________________ Beliveau & Pachios, Peter L. Murray and Law Offices of Peter ___________________ ________________ _____________________ Murray were on brief for Acadia Motors, Inc., et al. ______ ____________________ January 24, 1995 ____________________ -2- TORRUELLA, Chief Judge. This appeal involves a dispute TORRUELLA, Chief Judge. ___________ between thirty-two Maine automobile dealers (the "Dealers") and Ford Motor Company ("Ford") over Ford's compliance with the Maine warranty reimbursement statute, 10 M.R.S.A. 1176 (Me. Rev. Stat. Ann., tit. 10 1176 (West 1994)). On cross-motions for summary judgment, the district court ruled that in order to comply with the Maine statute, Ford must revise the window stickers on its cars sold in Maine to reflect the surcharge Ford had instituted to recover its costs of complying with 1176. The district court refused, however, to award damages or restitution to the Dealers on their claims that Ford had violated the statute. In addition, the district court dismissed the Dealers' remaining claims under the Robinson-Patman Act, 15 U.S.C. 13(a) (1988), and 10 M.R.S.A. 1174(1) and 1182 (Me. Rev. Stat. Ann., tit. 10 1174(1), 1182 (West 1994)). For the reasons set forth below, we affirm in part and reverse in part the decision of the district court. BACKGROUND BACKGROUND A. The Manufacturer-Dealer Relationship A. The Manufacturer-Dealer Relationship ____________________________________ Ford manufactures automobiles and sells them through a nationwide network of franchise dealers. The franchise agreement, called the Sales and Service Agreement (the "Agreement"), defines the manufacturer-dealer relationship. Ford offers a warranty with all new cars. Under the warranty, certain repairs, replacements, or adjustments are made free of charge to the consumer. The Dealers are required under their Agreements -3- with Ford to perform labor and to provide parts in satisfaction of the warranties. Ford is obligated both under the Agreements and under Maine statute to reimburse the Dealers for parts used and warranty work performed. Historically, and until 1993, Ford reimbursed the Dealers for parts under a uniform national reimbursement formula. Under this nationwide formula, each dealer is eligible to be reimbursed at wholesale cost, plus 30-40 percent above cost, depending on the vehicle model year. B. State Legislation B. State Legislation _________________ The State of Maine regulates the manufacturer-dealer relationship by statute, see 10 M.R.S.A. 1171 et seq., ___ __ ____ including warranty reimbursement levels. Originally, Maine's warranty reimbursement statute required car manufacturers, including Ford, to "adequately and fairly compensate the franchisee for any parts provided in satisfaction of a warranty created by the franchisor." 10 M.R.S.A. 1176 (1980). In 1991, however, 1176 was amended to require manufacturers to reimburse dealers at retail-equivalent rates. It currently provides in pertinent part: If a motor vehicle franchisor requires or permits a motor vehicle franchisee to perform labor or provide parts in satisfaction of a warranty created by the franchisor, the franchisor shall properly and promptly fulfill its warranty obligations, in the case of motor vehicles over 10,000 pounds gross vehicle weight rating, shall adequately and fairly compensate the franchisee for any parts so provided and, in the case of all other motor vehicles, shall reimburse the ___________________ -4- franchisee for any parts so provided at _________________________________________ the retail rate customarily charged by _________________________________________ that franchisee for the same parts when _________________________________________ not provided in satisfaction of a _________________________________________ warranty. ________ 10 M.R.S.A. 1176 (1991) (Me. Rev. Stat. Ann., tit. 10 1176 (West 1994)) (emphasis added). Notably, the amended statute requires warranty parts reimbursement "at the retail rate customarily charged for the same parts when not provided in satisfaction of a warranty." 10 __________ M.R.S.A. 1176 (emphasis added). The statute requires a match between the warranty part and the part actually sold by that particular dealer to a non-warranty customer. For example, a particular dealer's profit margin on the retail sale of a headlight cannot be used to determine the appropriate reimbursement percentage when the dealer, or another dealer, replaces a water pump under warranty. C. Events Leading to this Lawsuit C. Events Leading to this Lawsuit ______________________________ Following the 1991 amendment to 1176, several Maine dealers notified Ford that the new law entitled them to higher warranty reimbursement. In 1992, one Maine dealer filed claims in small claims court for reimbursement. The small claims court dismissed those claims because the dealer had not submitted an adequate claim for reimbursement to Ford, which it found to be a prerequisite under the statute to reimbursement recovery. Darling's Bangor Ford/VW/Audi v. Ford Motor Co., No. BAN 92-sc- _____________________________ ______________ 229 (Me. Dist. Ct. 3, S. Pen., Oct. 20, 1992). In response to this dealer's challenge, however, Ford -5- revised its reimbursement policy in Maine, and announced to its Maine dealers on April 1, 1993 that the "cost-plus" mark-up for parts reimbursement would be raised for all Maine dealers to 63 percent. This percentage corresponds to the percentage over cost used to determine the manufacturer's suggested retail price of parts.1 With this announcement, however, Ford also stated that in order to recover this increase in its costs of doing business in Maine, it would also increase the wholesale price of each new vehicle sold, through assessment of a surcharge of approximately $160 per vehicle. The surcharge, called the "warranty parity surcharge," would appear on each dealer's monthly parts invoice in the month following the sale. The surcharge was imposed based on the number of cars sold, without regard to whether the dealer actually performed warranty work in that month.2 The Dealers filed this lawsuit in the United States District Court for the District of Maine, alleging that the surcharge was unlawful, requesting that the court enjoin the surcharge and order Ford to "disgorge" the surcharge monies already recovered. The Dealers argued that 1176 not only  ____________________ 1 Ford states that a dealer could obtain a higher reimbursement mark-up on a particular part merely by submitting the necessary documentation to Ford, in accordance with 1176 and Ford's established reimbursement procedures. 2 The Dealers submitted the affidavits of two dealers attesting that they paid more in surcharges than they received in increased reimbursement under the new policy. Ford points out, however, that while some dealers pay more in a given month under the new policy, others pay less and receive more. The surcharge, Ford stated during oral argument before this court, was calculated to recoup Ford's increased costs of doing business over time, __________ spreading those costs evenly among the dealers. -6- required higher warranty reimbursement levels, but also prohibited Ford from raising wholesale prices to recover the costs of paying those higher reimbursement levels. They argued that the surcharge effectively negated the higher reimbursement levels required by 1176, in contravention of the legislative purpose of the amended statute. The Dealers also alleged that Ford's surcharge violated the Automobile Dealers Day in Court Act and the Robinson-Patman Act, and made claims under other Maine statutes. Ford moved to dismiss under Fed. R. Civ. P. 12(b)(6) or alternatively for summary judgment under Fed. R. Civ. P. 56 on the grounds that, as a matter of law, the warranty reimbursement level and the surcharge were lawful.3 The Dealers also moved for partial summary judgment, seeking a final injunction against the price increase, and requesting damages and other relief. They argued that any price increase to recover the reimbursement rate required by 1176 was itself a violation of the statute. They contended that the Maine legislature, in amending 1176, had intended that the cost of Ford's warranty be borne by Ford, and not by the Dealers, and that the surcharge improperly shifted the financial burden back to the Dealers. According to the Dealers, 1176 was about "dealers' rights," and thus any ___  ____________________ 3 Ford also raised challenges to the statute on various federal statutory and constitutional grounds. The district court rejected these challenges, and Ford has not raised them in this appeal. -7- wholesale price increase was unlawful.4  ____________________ 4 The Dealers also argued that, in the alternative, the only lawful way for Ford to recoup its increased costs was to institute a wholesale price increase nationwide. The district court rejected this suggestion, and the Dealers do not raise it on appeal. -8- D. The District Court's Orders D. The District Court's Orders ___________________________ 1. The February Order 1. The February Order The district court ruled on the parties' motions on February 15, 1994, treating both motions as ones for summary judgment. The parties offer vastly different interpretations of the February Order. We acknowledge that the court's conclusions are not crystal-clear. We do not think, however, that the court's decision is fairly subject to such disparate readings as given by the parties. First, the district court denied the Dealers' request for damages based on Ford's alleged past failures to reimburse the Dealers according to the amended 1176. The court ruled that the Dealers did not make an adequately particularized claim to Ford prior to bringing suit. The court then addressed the Dealers' objections to Ford's reimbursement policy and warranty parity surcharge. Regarding the Dealers' arguments that the 63 percent reimbursement rate was not sufficient under 1176, the court stated: The plain language of 1176 requires that Ford reimburse its dealers "at the retail rate customarily charged by that ___________ ____ franchisee for the same parts when not __________ provided in satisfaction of a warranty." 10 M.R.S.A. 1176 (Supp. 1993) (emphasis added). Literally this requires Ford to pay a dealer the same rate that that particular dealer would have charged for that particular part if the dealer had provided it to a nonwarranty customer. Ford's policy of reimbursing dealers at the suggested list price may or may not satisfy 1176 depending on whether the -9- individual dealer customarily charges more or less than Ford's suggested list price. . . . As discussed above, the ___ Dealers have not submitted a sufficiently _________________________________________ particularized claim to Ford in order to _________________________________________ recover for Ford's past alleged _________________________________________ underpayments. Moreover, the Dealers _____________ have failed to submit enough factual ___________________________________ material from which the Court can _________________________________________ determine whether Ford's practice of _________ reimbursing dealers at 63% above dealer cost violates 1176. On these grounds, the court denied the Dealers' motion for partial summary judgment, declining to find Ford liable for damages, declare Ford's current reimbursement rate illegal, or issue an injunction requiring that Ford reimburse the Dealers at a higher rate. The court then addressed the Dealers' arguments that the warranty parity surcharge violates 1176. The court first rejected the Dealers' claim that Ford has no right to recover its increased costs of compliance with the Maine statute. The court went on, however, to state that Ford may not recover its cost "in such a way as to thwart the purpose of the legislation," and found that the $160 warranty surcharge did just that. The court stated that the surcharge contravened the "legislative intent" behind 1176 and was thus "inappropriate." In reaching this conclusion, the court relied by analogy upon the New York "Lemon Law" cases.5 The court stated: Similarly, if Ford had simply increased the wholesale price of its vehicle and ___ reflected this increased price in its  ____________________ 5 See discussion infra regarding the district court's use of the ___ _____ New York Lemon Law cases. -10- suggested retail price for automobiles sold in Maine, the Court would likely ________________________ have reached a different conclusion. ________________________________________ Ford, however, increased its warranty parts reimbursement to dealers only to recoup these costs directly from dealers on the same parts statement. Ford's actions fly in the face of 1176. . . . Ford may increase its wholesale ___ automobile prices in Maine without a corresponding increase elsewhere in the country. If Ford chooses to increase its ________________________________ wholesale prices in Maine, however, it _________________________________________ must revise its so-called Monroney _________________________________________ stickers for automobiles sold in Maine so _________________________________________ that the increased price of automobiles _________________________________________ is not shouldered only by the dealer. . . ____________________________________ . This Court finds that Ford's warranty parity surcharge, as it is currently _____________________ structured, is illegal and enjoins Ford __________ from continuing with this practice. (Footnotes omitted) (emphasis added). The court therefore ruled that Ford may pass on the increased costs of compliance, but may do so only if it also instituted a corresponding increase in each car's "sticker" price.6 This sticker price issue had never been briefed by the parties, although it was discussed during the summary judgment hearing. 2. The March Order 2. The March Order Both parties moved to modify the February Order. The Dealers requested that the district court issue a declaratory judgment declaring the warranty parity surcharge illegal and order Ford to refund the warranty surcharges already paid. Ford requested that the court modify its order to allow Ford to  ____________________ 6 15 U.S.C. 1232 requires that auto manufacturers affix a label, the so-called "Monroney sticker," on each new automobile, disclosing information such as the suggested retail price, the price for each accessory or optional equipment, and transportation charges. -11- implement its price increase by including an additional amount on the dealer invoice, rather than by increasing the Monroney sticker price.7 In an order issued March 30, 1994, the district court denied Ford's request, stating that Ford was effectively seeking a "prospective advisory opinion" on an issue not ripe for disposition. The court then denied the Dealers' request for a refund of the already-paid surcharges, explaining that its February Order was only to apply prospectively. The March Order did little to clarify the court's original ruling, but merely reiterated that "Ford's warranty parity surcharge, as it is currently structured, is illegal." The court also dismissed the remaining counts of the Dealers' Complaint. Both parties appealed. DISCUSSION DISCUSSION A. Standard of Review A. Standard of Review __________________ We review a district court's grant of summary judgment de novo and read the record in a light most favorable to the non- __ ____ moving party, drawing all inferences in the non-moving party's favor. LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. _______ __________________ 1993), cert. denied, __ U.S. __, 114 S. Ct. 1398, 128 L.Ed.2d 72 _____ ______ (1994). We likewise afford de novo review to a district court's __ ____ dismissal of a claim under Fed. R. Civ. P. 12(b)(6). Vartanian _________ v. Monsanto Co., 14 F.3d 697, 700 (1st Cir. 1994) (citations ____________ omitted). We must accept the allegations of the complaint as  ____________________ 7 The dealer invoice, unlike the Monroney sticker, shows the price actually paid to Ford by the dealer. -12- true, and if, under any theory, the allegations are sufficient to state a cause of action in accordance with the law, we must deny the motion to dismiss. Id. __ B. The Parties' Presention of the Issues B. The Parties' Presention of the Issues _____________________________________ As stated above, the parties offer disparate interpretations of the district court's ruling. Because of their different versions, their framing of the issues relevant to this appeal differs broadly. The Dealers insist that the "central issue" in this action is whether Ford's $160 surcharge violates 1176, as they repeatedly contend the district court found, and "what relief should flow to the Dealers." Ford, on the other hand, argues that the district court ruled that Ford may ___ institute a wholesale price increase, but only if it also ____ increases the Monroney sticker price. Ford's primary argument on appeal, accordingly, is that this sticker price increase is not required by 1176, and indeed, brings 1176 into conflict with federal law. Fortunately, our analysis of the issues raised on appeal does not require that we accept one party's "version" over the other.8 Because we are able here to analyze each of the  ____________________ 8 We do not believe, however, that the Dealers are correct in their contention that the district court found the surcharge "illegal" in and of itself. In offering this interpretation, the Dealers take the court's use of the word "illegal" out of the sentence and out of its context. The district court did not state that the surcharge was per se illegal, but rather that it ___ __ was illegal "as it is currently structured" and allowed a wholesale price increase only on the condition that it be ____ accompanied by a sticker price increase. Indeed, the court stated that if Ford had instituted an accompanying sticker price increase, the court may have ruled differently. -13- parties' arguments without addressing the dispute over the district court's ruling, the ambiguities in the court's opinion are rendered irrelevant. C. The "Sticker Price" Increase Requirement C. The "Sticker Price" Increase Requirement ________________________________________ We first address Ford's argument that the district court erred by interpreting 1176 to require that a wholesale price increase must be matched by a corresponding increase to the suggested retail, or "sticker" price. Ford contends that there is absolutely nothing in the language of 1176 to even suggest this requirement, and that it likewise cannot be justified by some vague reference to "legislative intent." Because this issue involves the interpretation of a Maine state statute, we are bound to apply the principles set forth by Maine's Supreme Judicial Court. That court has repeatedly held that courts must look to the language of a statute to find its meaning. State Farm Mut. Auto Ins. Co. v. ______________________________ Universal Underwriters Ins. Co., 513 A.2d 283, 286, (Me. 1986). ________________________________ When interpreting that language, courts must give the unambiguous wording of a statute its plain and ordinary meaning. Stanley v. _______ Tilcon Maine, Inc., 541 A.2d 951, 952 (Me. 1988). Only when the ___________________ language of the statute is ambiguous should courts look beyond the words of the statute to its history, policy or other extrinsic aids to ascertain statutory intent. Central Maine ______________ Power Co. v. Maine Pub. Utils. Comm'n, 436 A.2d 880, 885 (Me. _________ _________________________ 1981). Our analysis of this issue has two components. First, -14- we must address whether, as an initial matter, the district court correctly rejected the Dealers' arguments that Ford had no right to pass on its increased costs of doing business resulting from compliance with 1176. Then we examine whether the court's order requiring Ford to institute a sticker price increase was supported by the statute. Nothing in the language of 1176 prohibits a manufacturer from increasing vehicle prices in order to recover its increased compliance costs. The statute says nothing about wholesale or retail prices, and apparently leaves the manufacturer free to increase wholesale prices, and the dealer to increase retail prices. The legislative history of the amended statute also does not indicate that the Maine legislature intended to set price controls or to force manufacturers to wholly bear the costs of compliance. Moreover, as Ford points out, it is quite commonplace for manufacturers and other regulated entities to pass on to retailers and consumers their costs of complying with regulatory statutes. This is so even when the costs are passed on to the "beneficiaries" of the regulations. See, e.g., Motor & Equip. Mfrs. Ass'n v. E.P.A., ___ ____ ____________________________ ______ 627 F.2d 1095, 1118 (D.C. Cir. 1979) (environmental regulations will increase cost of new cars for consumers), cert. denied, 446 _____ ______ U.S. 952 (1980); Motor Vehicle Mfrs. Ass'n v. Abrams, 684 F. __________________________ ______ Supp. 804, 806 (S.D.N.Y. 1988) (charges for manufacturers' compliance with New York's "Lemon Law" may be passed on to auto consumers). Therefore, we hold that the district court properly -15- ruled that 1176 does not prohibit Ford or other manufacturers from recovering their costs of compliance. Just as the statute contains no language restricting cost recovery, it also contains no language conditioning cost ____________ recovery. The statute deals solely with warranty reimbursement transactions between manufacturer and dealer, and no mention is made of any other contingencies. The Dealers have not pointed to one word contained in 1176, nor can we find one, that suggests that the statute contemplates anything other than the limited subject of warranty reimbursement. The legislative history to 1176 also lacks any indication that the Maine legislature intended to condition a manufacturer's recovery of its compliance costs. As we noted above, Maine law initially required only that manufacturers "adequately and fairly compensate each of its motor vehicle dealers for labor and parts." When the Maine legislature amended 1176 in 1980 to provide that reimbursement for labor be at the _____ customary retail rate, the legislature explained in its Statement of Fact: With their superior bargaining position, automakers have in the past forced dealers to accept reimbursement at a rate substantially lower than the dealers' usual retail rate. The net effect has been that, through an inflated labor _____ rate, non-warranty customers have _________ subsidized automakers who were unwilling to pay the fair and full price for repairs made necessary when their automobiles failed to meet warranty standards. This section prevents _________________________ recurrence of this problem . . . . __________________________ -16- Me. L.D. 1878, 109th Leg., 2d Sess. (1980) (Statement of Fact) (emphasis added). In 1991, when the legislature amended 1176 to require that dealers be compensated for parts at the customary _____ retail rate, it stated only that the purpose of the amendment was to make compensation for parts the same as compensation for labor. Me. L.D. 1235, 115th Leg., 1st Sess. (March 21, 1991) (Statement of Fact). Quite simply, this sparse legislative history fails to suggest any statutory purpose or legislative intent to prevent or condition manufacturers' cost recovery.9 It certainly does not indicate, either expressly or implicitly, that warranty reimbursement costs cannot be passed on by manufacturers to dealers, and then from dealers to consumers. It simply and solely regulates the rates at which manufacturers must reimburse dealers for warranty labor and parts. We therefore cannot find, nor can we reasonably or fairly infer, that the legislature intended to prohibit or condition manufacturer cost recovery. In light of this complete dearth of statutory or historical evidence supporting the district court's order that Ford revise its Monroney stickers, we must find that the district court's order  ____________________ 9 In fact, if anything, the legislative history belies the Dealers' contention that the statute was amended to "protect" dealers. We think that an objective reading of the legislative history indicates the legislature decided that warranty reimbursement levels would be at retail rates, in order to prevent non-warranty customers from being charged prices much higher than the customary retail rates. Therefore, if anything, the statute was arguably meant to protect non-warranty consumers ____________ _________ from inflated prices charged by dealers who are attempting to maintain their average profit margins in the face of a manufacturer's below-retail reimbursement rates. -17- is completely unsupported by the state law, and therefore erroneous. In making its determination, the district court relied by analogy on the New York "Lemon Law" cases. This reliance is misplaced. In State of New York v. Ford Motor Co., the New York __________________ ______________ Court of Appeals held that Ford's written warranty, which stated that the retail purchaser of a vehicle would be required to pay the first $100 of any warranty repair charge, violated the New York state "Lemon Law," N.Y. Gen. Bus. Law 198-a (McKinney's 1983). State of New York v. Ford Motor Co., 548 N.E.2d 906, 908- _________________ ______________ 909 (N.Y. 1989). The court's ruling rested entirely on the plain language of the statute, which provided that when a new motor vehicle does not conform to all express warranties for the earlier of its first two years or 18,000 miles, "the manufacturer . . . shall correct said nonconformity . . . at no charge to the ____________________ consumer." (emphasis added). As the court recognized, "[i]t is ________ difficult to imagine the disputed $100 deductible being more easily resolved" than by the plain, unequivocal language of the statute. State of New York, 548 N.E.2d at 909. _________________ In response to the New York court's ruling on the $100 deductible, Ford discontinued the deductible, but, along with other manufacturers, instituted a Lemon Law-related surcharge assessed on all vehicles sold in New York. Ford, at its own ___________ initiative, placed this surcharge on its Monroney sticker, __________ describing it as "N.Y. Mandatory Repair Coverage Option." Motor _____ Vehicle Mfrs. Ass'n, 684 F. Supp. at 805. When the New York ____________________ -18- legislature passed a law prohibiting manufacturers from placing this item on the Monroney sticker, the district court struck down the law as an unconstitutional restraint on lawful commercial speech. Id. at 808. In so doing, the court noted that "it is __ entirely lawful for an automobile manufacturer to impose on its customers a charge resulting from the costs of compliance with the Lemon Law." Id. at 806.  __ The Lemon Law cases offer little support for the district court's order here. First, the plain language of the Lemon Law specifically prohibited the deductible at issue before the state court, whereas the Maine statute involved here does not either expressly or implicitly require the district court's result. More importantly, although the New York district court recognized that Ford could recover its costs of compliance with the Lemon Law, the court did not require a corresponding sticker price increase; rather, Ford instituted such an increase in that situation voluntarily, as a result of its own business decisions. Its sticker price increase was not mandated or suggested by the Lemon Law itself, nor by the state court's opinions. In the case at bar, the district court's reliance on the Lemon Law cases to support its own ruling that Ford must increase its Monroney ____ sticker price is entirely unfounded. Finally, the district court's order cannot be salvaged by its references to some unspecified and vague notion of "legislative intent." It is not appropriate for a federal district court, however well-intentioned, to set forth a rule -19- unsupported by a state statute. As we have repeatedly warned, federal courts must take great caution "when blazing new state- law trails." Pearson v. John Hancock Mut. Life Ins. Co., 979 _______ _________________________________ F.2d 254, 259 (1st Cir. 1992). Because nothing in 1176 or its history conditions cost recovery by a manufacturer, the district court was not authorized to impose such a condition on the basis of some inferred legislative policy. The court therefore overstepped the bounds of its authority and entered territory properly left to the Maine legislature when it ordered Ford to revise its Monroney stickers on cars sold in Maine.10 Accordingly, we reverse the portion of the district court's order requiring Ford to institute a Monroney sticker price increase. D. The Dealers' Claims for "Disgorgement" D. The Dealers' Claims for "Disgorgement" ______________________________________ The Dealers argue that the district court erred in refusing to order Ford to repay to the Dealers all funds collected through the "illegal" warranty parity surcharge. The Dealers explain that in requesting the return of the surcharges, they were seeking the equitable remedy of restitution, the disgorgement of funds obtained under an unlawful policy.11 The  ____________________ 10 Because we find the district court's order erroneous, we need not address Ford's arguments that the order brings 1176 into conflict with federal law. 11 The Dealers rely on Porter v. Warner Holding Co., 328 U.S. ______ ___________________ 395, 402 (1946) and Tull v. United States, 481 U.S. 412, 424 ____ ______________ (1987) in support of their contentions. However, as revealed by our analysis, these cases do not control here. The central issue in Porter v. Warner Holding Co. was whether the Emergency Price ______ ___________________ Control Act of 1942, establishing national rent controls, limited the power of federal courts to order restitution of excessive rents collected in violation of the Act. Porter, 328 U.S. at ______ 396. The improper profits at issue in the Porter case were rents ______ -20- district court denied the Dealers' request for "disgorgement" on the grounds that the Dealers may have actually passed on the cost of the surcharge to their customers, and therefore, presumably, the Dealers sustained no actual injury. In support of their contention, the Dealers explain in their brief that the Maine legislature "intended and required that Ford pay more" than it had previously been paying. ____ (Emphasis in original). The Dealers argue that in amending 1176, the legislature "intended that the financial burden of supplying Ford's warranty be borne by Ford, not by the Dealers," and that 1176 is a "cost-shifting" statute. Because the warranty parity surcharge recovered the very funds that Ford was paying under the amended 1176, Ford was "illegally" paying to the Dealers less than was statutorily required. This argument rests on the unfounded premise that 1176 prevents Ford from recovering its compliance costs. It is clear that in amending 1176, the Maine legislature intended  ____________________ collected in direct violation of a statute specifically establishing price controls. As we discussed above, 1176 does not establish price controls, nor mandate that manufacturers solely bear the burden of compliance. To the contrary, 1176 merely sets forth warranty reimbursement levels, and leaves unregulated the methods by which affected parties may bear or pass on the costs of compliance. The Tull case is also inapposite. The "quotation" offered by ____ the Dealers in their brief was pulled out of the most tangential dictum from that case, during which the Court was merely discussing (and rejecting) the government's analogy between civil penalties under the Clean Water Act and equitable actions of disgorgement. Moreover, not only is the Dealers' proffered "quotation" from that case taken out of context, but manipulated so as to acquire a meaning nothing like the original. We do not appreciate such fast-and-loose use of case law. -21- that the manufacturers "pay more" in warranty reimbursements. It is not at all clear, however, that the legislature intended that manufacturers simply absorb those costs, and could not pass them on by means of a wholesale cost increase, a dealer surcharge, or a retail cost increase. There is no support for the Dealers' contention that 1176 is a "cost-shifting" statute, and as we explained, we will not infer such legislative intent without any evidence whatsoever. The Dealers' position that 1176 prevents Ford from recovering its costs is therefore incorrect. It follows that their contention that the surcharges -- Ford's chosen mechanism for cost recovery -- were unlawfully collected, is also incorrect. Because the surcharges were not unlawful, then, Ford was not unjustly enriched. In any case, after carefully reviewing the entire record, we agree with the district court that the Dealers have not shown that they actually absorbed the cost of the surcharges and did not pass them on to their customers in the form of higher prices. If the Dealers have passed on their costs, then awarding restitution of the surcharges would result in a windfall double recovery by the Dealers. In sum, neither the language or purpose of the statute, nor the facts on record, support the Dealers' claim for restitution of surcharges already collected by Ford. We therefore affirm the district court's rejection of this claim. E. The Dealers' Other Claims E. The Dealers' Other Claims _________________________ 1. Robinson-Patman Act Claims 1. Robinson-Patman Act Claims -22- The Dealers argued before the district court that Ford dealers in neighboring states, such as New Hampshire, are in the same geographical marketing area as the Maine Dealers. By imposing additional costs in Maine but not in those other states, the Dealers contended that Ford violated the Robinson-Patman Act, 15 U.S.C. 13(a). The Dealers argue on appeal that, assuming the district court properly denied disgorgement of the surcharges, the court's dismissal of their claims for price discrimination under relevant portions of the Robinson-Patman Act was erroneous, and that these claims should have been left open for a trial on the merits. Our standard for reviewing a Fed. R. Civ. P. 12(b)(6) dismissal is clear: a complaint is to be construed in the light most favorable to the plaintiffs, here the Dealers. Finnern v. _______ Sunday River Skiway Corp., 984 F.2d 530, 534 (1st Cir. 1993) ___________________________ (citations omitted). Dismissal is appropriate only if it appears beyond doubt that the plaintiffs can prove no set of facts in support of their claim which would entitle them to relief. Finnern, 984 F.2d at 534.  _______ The pertinent portion of the Robinson-Patman Act provides: It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between purchasers of commodities of like grade and quality, . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or -23- prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them . . . . 15 U.S.C. 13(a) (1988). The Act, however, also creates a "safe harbor" based on reasonable price differentials "which make only due allowance for differences in the cost of manufacture, sale or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered. . . ." Id. The district court ruled that Ford would __ not be in violation of the Act if it could establish that its cost of selling vehicles in Maine were reasonably related to its differences in costs -- in other words, that it fell within the "safe harbor." The Supreme Court has explained that the Robinson-Patman Act was enacted to "curb and prohibit all devices by which large buyers gained discriminatory preferences over smaller ones by virtue of their greater purchasing power." Federal Trade Comm'n v. Henry Broch & Co., 363 U.S. 166, 168 ____________________ ___________________ (1960). The Act was an amendment to the antitrust laws, specifically the Clayton Antitrust Act. Id. at 167-168. __ Our reading of the Dealers' allegations, viewed in the light most favorable to them, does not support a claim that Ford's increase in its vehicle prices was a price differential of the type prohibited by the Robinson-Patman Act. Any differences in vehicle prices resulting from the higher warranty reimbursement levels would fall squarely within the safe harbor allowed by the Act, and therefore be lawful. Because the Dealers have not alleged facts sufficient to sustain their Robinson- -24- Patman claims, we cannot agree that these "issues" remain open for trial. We therefore find that the district court properly dismissed the Dealers' Robinson-Patman claims, and we affirm this dismissal. 2. Claims under 10 M.R.S.A. 1174(1) 2. Claims under 10 M.R.S.A. 1174(1) The Dealers contend that the district court erroneously dismissed their claims that Ford had engaged in unfair methods of competition and unfair and deceptive practices, in violation of 10 M.R.S.A. 1174(1). They argue that those claims should be tried on their merits. The Dealers' 1174(1) claims, however, rest upon their allegations that Ford's warranty surcharge was illegal. As we held above, the surcharge did not violate 1176. Thus, in light of the fact that Ford committed no unlawful acts in instituting its warranty surcharge, the Dealers' 1174(1) claims necessarily collapse. We therefore hold that these claims were properly dismissed, and we affirm the dismissal. 3. Claims under 10 M.R.S.A. 1182 3. Claims under 10 M.R.S.A. 1182 Finally, the Dealers assert that the district court erred in dismissing their claims that Ford's warranty surcharge violated public policy within the meaning of 10 M.R.S.A. 1182. Section 1182 authorizes courts to grant declaratory and injunctive relief for practices in violation of certain Maine statutes, including 1176. Because, as we have explained, we find that Ford did not violate 1176, the Dealers' claims under 1182 are moot. -25- CONCLUSION CONCLUSION For the foregoing reasons, the district court's opinion is affirmed in part and reversed in part. Remanded for actions ________________ ________________ ________ consistent with this opinion. No costs to either party. -26-