KRONON MOTOR SALES, INCORPORATED, Plaintiff–Appellant,

v.

FORD MOTOR COMPANY, Defendant–Appellee.

Nos. 94–2073, 94–2138.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 27, 1994.

Decided Nov. 30, 1994.

---

Jonathan P. Geen, Richard M. Karr (argued), Hardt & Stern, Chicago, IL, for plaintiff-appellant.

Sarah J. Goldberg, Ford Motor Co., Office of the General Counsel, Dearborn, MI, Michael R. Feagley, James C. Schroeder (argued), Joel S. Schreier, Mayer, Brown & Platt, Chicago, IL, for defendant-appellee.

Before POSNER, Chief Judge, and ESCHBACH and RIPPLE, Circuit Judges.

POSNER, Chief Judge.

Kronon Motor Sales, a Lincoln–Mercury dealer in Illinois, appeals from the dismissal, on the defendant's motion for summary judgment, of this diversity suit against Ford Motor Company for violation of the Illinois Motor Vehicle Franchise Act, 815 ILCS 710. The case concerns warranty work, for which, of course, the dealer is paid by Ford rather than by the owner of the car on which the work is done. For the service component of such work, Ford pays Kronon the hourly rate that Kronon charges its paying (i.e., nonwarranty) customers times the number of hours Ford considers appropriate for the type of repair or other service in question. The suit charges that Ford sometimes refuses to pay Kronon's regular hourly rate, as we shall see the Act requires; but Ford met this allegation with unrebutted affidavits which demonstrate that the allegation is baseless, so we discuss it no further. When replacing parts under warranty, the dealer is required to use parts that it buys from Ford at prices set by Ford, and Ford reimburses the dealer at the price the dealer paid for the part plus a mark-up fixed by Ford and ranging from 30 percent to 40 percent, depending on the vintage of the car; the more recent, the higher the mark-up. Ford's right to determine the mark-up is conferred by the franchise agreement between Ford and Kronon, made in 1972. The agreement, terminable by either party, remains in force, although from time to time the price that Ford charges for particular parts, as well as the mark-up for which it reimburses the dealer, has changed. Kronon charges a higher mark-up to its paying customers than Ford will reimburse for warranty service, and it seeks by this suit the difference, which over four years has mounted up to almost $700,000.

Ford interposed a number of defenses to Kronon's suit. The district judge accepted two and ignored the rest. The two he accepted, which relate to Kronon's failure to have submitted claims to Ford for higher reimbursement in the form arguably required by the franchise agreement and in a timely fashion, merely precipitated a second suit by Kronon, now pending in the district court, based on Ford's rejection of the formal claims that Kronon submitted in the wake of the district judge's decision in the present case. We agree with Ford that the flaw in Kronon's claim goes deeper. The Motor Vehicle Franchise Act does not require Ford to reimburse its dealers for parts furnished under warranty at a mark-up equal to what the dealer charges to its regular paying retail customers. Ford raised this defense in the district court and has renewed it in this court, and we are therefore authorized to decide it even though the district court did not address it. *Resolution Trust Corp. v. Thompson*, 989 F.2d 942, 943 (7th Cir.1993). It is a pure issue of law, moreover, involving the interpretation of a statute, hence an issue on which we could not defer to the district court even if that court had reached it.

The Act requires the manufacturer to "adequately and fairly compensate each of its motor vehicle dealers for labor and parts." 815 ILCS 710/6(a). "In the determination of what constitutes reasonable compensation ..., the principal factor to be given consideration shall be the prevailing wage rates being paid by the dealers in the relevant market area in which the motor vehicle dealer is doing business, *and in no event shall such compensation of a motor vehicle dealer for warranty service be less than the rates charged by such dealer for like service to retail customers of nonwarranty service and repairs.*" 815 ILCS 710/6(b). Kronon fastens on the passage that we have italicized, which it interprets to mean that the dealer is entitled to be reimbursed for parts sold under warranty at the same prices that it charges its nonwarranty customers. That is not what the passage says. It says that the dealer is entitled to reimbursement for "warranty service" at the same "rates" it charges its nonwarranty customers for "service and repairs." There is no reference to parts. This is not surprising, when we consider that the preceding clause in section 6(b) says that the principal factor in reasonable compensation is the prevailing "wage rates" in the dealer's market. It is a factor only in the labor component of warranty work. It does not enter at all into the price of a part.

None of Kronon's labor is in the part. There is labor in installing the part but that is covered by the provision for compensation for "labor" in section 6(a) and is computed according to the parity-with-prevailing-wage-rates provision in section 6(b).

The passage that we have quoted from section 6(b), the passage on which Kronon's suit depends, was added by amendment four years after the passage of the original Act, which had imposed the duty of fair compensation "for labor and parts" that now appears in section 6(a). P.A. 81–43, § 6, eff. June 29, 1979; P.A. 83–922, § 1, eff. Nov. 3 (1983). Remarkably, in the eleven years since the amendment, no Illinois court has had occasion to examine it in a published opinion. (There is one district court opinion, but it does not bear on the issue in this case.) There is no pertinent legislative history. And there are no published opinions interpreting parallel language in other states' automobile dealer statutes.

As best we can reconstruct the purpose of the amendment with the limited materials at our disposal, it was solely to regulate compensation for the labor component of warranty work. Manufacturers must not have been reimbursing the dealers' labor costs at the wage rates prevailing in the dealers' markets, and this must have put the dealers in a bind, as they had to pay those rates to get competent workers to do warranty work. So the amendment was passed, commanding the manufacturers to reimburse the dealers at the prevailing market wage rates and, to make assurance doubly sure, entitling the dealers to reimbursement from the manufacturers at whatever rates the dealers were charging their paying customers. There is no indication that the legislature intended to do anything about parts reimbursement. There is, as we have pointed out, no reference to parts. Had the legislature intended to establish a rule of parity for parts as well as labor, it could have said so very simply; there would have been no occasion even to mention wage rates; the statute would have been a lot shorter, and no reason for its unnecessary (if Kronon's interpretation is correct) length has been offered. In 1983, when the amendment was passed, five states

had warranty compensation statutes that applied expressly to parts. Ky.Rev.Stat. § 190.046(2) (1982); Minn.Stat. § 80E.04(2) (1981); Mont.Code § 61–4–204(4) (1977); N.J.Stat. § 56:10–15(a) (1977); Ohio Rev. Code § 4517.52 (1981). (Today there are 19 such states.) These statutes entitled the dealer to his normal retail, or nonwarranty, rate. Their existence makes it less likely that the Illinois legislature omitted mention of parts simply because everyone would know that "service" included parts. Apparently the other states did not think everyone would leap to this conclusion, for they provided expressly that parts would be covered. The Ohio statute was all of one sentence long; it would have provided a simple model for Illinois, had Illinois wanted to cover parts as well as labor.

Kronon argues that it would be senseless to distinguish between labor and parts, for then Ford might emasculate the provision requiring parity of reimbursement for labor costs simply by cutting the allowed mark-up on parts. That is a danger, all right; see *Acadia Motors, Inc. v. Ford Motor Co.*, 844 F.Supp. 819, 829–30 (D.Me.1994). There is nonetheless a significant difference between the two types of warranty work. The basic formula for reimbursement of the pure service (labor) component is an hourly wage rate times the number of hours the repair or other servicing in question is estimated to take. If the estimate is accurate on average, this formula amounts to a pure dealer cost pass-through, with no allowance for profit to cover the fixed expenses of the dealership. If the manufacturer pays a lower hourly rate than the rate that the dealer must pay to hire workers to perform warranty service, that service will be provided at an out-of-pocket loss to the dealer. It is apparently to this acute danger that the Illinois legislature reacted in the 1983 amendment. With regard to parts, however, Ford allows the dealer a hefty mark-up on every part sold. That mark-up is not pure gravy, for it must cover all the dealers' expenses relating to warranty work (ranging from rent to insurance—expenses that are higher than they would be if the dealer had no warranty work and could therefore get by with a smaller service department) that are not directly reimbursed.

Still, it would be surprising if the dealer required as large a mark-up for warranty as for nonwarranty work, since he does not incur selling costs or a significant risk of nonpayment when doing such work.

In light of the considerations that we have mentioned, we think the better interpretation of the statute is that it does not require the manufacturer to reimburse parts sold by its dealers under warranty at the same prices at which the dealers sell the same parts to their paying customers. If dealers want broader protection against the manufacturers, they must seek it from the legislature.

AFFIRMED.