**ALLIANCE OF AUTOMOBILE MANUFACTURERS,**
**Plaintiff,**

**v.**

**Dan A. GWADOSKY, et al., Defendants.**

**No. CIV.03–154–B–W.**

United States District Court,
D. Maine.

Feb. 13, 2004.

Bruce W. Hepler, Friedman, Gaythwaite, Wolf & Leavitt, Portland, ME, John J. Sullivan, Mayer, Brown, Rowe & Maw, Washington, DC, Russell R. Eggert, Mayer, Brown, Rowe & Maw, Chicago, IL, for Alliance of Automobile Manufacturers, Plaintiff.

Francis E. Ackerman, Assistant Attorney General, Augusta, ME, for Secretary

of State, Maine, Attorney General, Maine, Defendants.

## ORDER ON PLAINTIFF ALLIANCE OF AUTOMOBILE MANUFACTURERS' MOTION FOR PRELIMINARY INJUNCTION

WOODCOCK, District Judge.

On September 4, 2003, Alliance of Automobile Manufacturers (Manufacturers) filed a complaint with this court for declaratory and injunctive relief against Dan A. Gwadosky in his official capacity as Secretary of State of the State of Maine and G. Steven Rowe in his official capacity as Attorney General of the State of Maine (State). The Complaint seeks a declaration that Sections 10 and 12 of newly enacted L.D. 1294 are unconstitutional and an order preliminarily and permanently enjoining their enforcement. On October 9, 2003, the Maine Auto Dealers Association (Dealers) filed a motion for *amicus curiae* "plus" status and on December 22, 2003, the Court granted the Motion in part. On October 10, 2003, the State answered the complaint, denying its essential allegations. With the filing of the complaint, Manufacturers moved for a Preliminary Injunction against the enforcement of Section 10 of Maine Legislative Document 1294 (L.D.1294). On October 10, 2003, the

State filed an objection to the issuance of a preliminary injunction.

## I. Statement of Facts

To rule on this motion, it is necessary to reiterate the long, complex, and litigious history leading up to the enactment of L.D. 1294 and the filing of this case.[1] The two major players, the Manufacturers and the Dealers, have been engaged for nearly three decades in Maine in an elaborate and contentious game of economic, political, and legal chess.[2] The battle lines in this dispute have been drawn over how much money the Dealers will receive back from the Manufacturers when performing work under manufacturer warranty. There is substantial money at stake. During the year 2002, one manufacturer, Ford, imposed a price adjustment of $500 on each new car sold in Maine and, as a result, received back slightly more than $3.6 million dollars in that year alone. If other manufacturers follow Ford's lead, the dollars could prove serious.

The public tends to see the dealer-manufacturer relationship as symbiotic and unitary: the manufacturer designs and builds vehicles; the dealer sells and repairs them, all to their greater economic advantage. Beneath the surface, however, is an uneasy, often roiling relationship. Since the parties themselves have been unable over

---

1. In its recitation of facts, the Court has borrowed freely from the facts as set forth in the opinions of the First Circuit, the Maine Supreme Judicial Court, and Judges D. Brock Hornby, and the late Morton A. Brody of this Court.

2. It should come as no surprise that Maine is not alone. Litigation has percolated on a variety of issues involving manufacturer-dealer warranty reimbursement in New Jersey (*New Jersey Coalition of Auto. Retailers v. DaimlerChrysler Motors Corp.,* 107 F.Supp.2d 495 (D.N.J.1999)), (*Liberty Lincoln–Mercury v. Ford Motor Co.,* 134 F.3d 557 (3rd Cir.1998));

in New York (*Ralph Oldsmobile v. General Motors Corp.,* 2000 WL 1459767, 2000 U.S. Dist. LEXIS 14244 (S.D.N.Y.2000)), (*G/C Volkswagen Corp. v. Volkswagen of America, Inc.,* 1998 WL 799174, 1998 U.S. Dist. LEXIS 17987 (S.D.N.Y.1998)); in Vermont (*Northwood AMC Corp. v. American Motors Corp.,* 139 Vt. 145, 423 A.2d 846 (1980)); in Illinois (*Kronon Motor Sales v. Ford Motor Co.,* 41 F.3d 338 (7th Cir.1994)); in Ohio (*Jim White Agency Co. v. Nissan Motor Corp.,* 126 F.3d 832 (6th Cir.1997)); and in Florida (*Brandon Chrysler Plymouth Jeep Eagle, Inc. v. Chrysler Corp.,* 898 F.Supp. 858 (M.D.Fla.1995)).

the course of the last three decades to negotiate satisfactorily their conflicting positions in the warranty reimbursement area, they have each periodically sought to enlist the support of the legislative and judicial arms of government. Each legislative action has been followed by resort to the judicial branch, spawning new legislation and new judicial rulings, a seemingly never ending cycle, perfectly exemplified by the instant case. *See, e.g., Darling's v. Ford Motor Company,* 2003 ME 21, 825 A.2d 344; *Acadia Motors v. Ford Motor Co.,* 2002 ME 102, 799 A.2d 1228; *Nissan Motor Corp. In U.S.A. v. Darling's Honda/Nissan,* 1999 Me.Super. LEXIS 190 (Me.Super.Ct. July 7, 1999); *Darling's d/b/a Darling's Bangor v. Ford Motor Co.,* 1998 ME 232, 719 A.2d 111; *American Honda Motor Co. v. Darling's Honda/Nissan,* 1997 Me.Super. LEXIS 225 (Me.Super.Ct. July 27, 1997); *Darling's d/b/a Darling's Bangor v. Ford Motor Co.,* No. 95–CV–398–B–H (Me.D.1995); *Acadia Motors v. Ford Motor Co.,* 844 F.Supp. 819 (D.Me.1994), *aff'd in part, rev'd in part on other grounds,* 44 F.3d 1050 (1st Cir.1995); *Darling's Bangor Ford/VW/Audi v. Ford Motor Co.,* 92–SC–229 (Me.Dist.Ct.3, S.Pen., Oct. 20, 1992).

Alliance is a trade association of ten car and light truck manufacturers.[3] Its members account for more than 90% of all motor vehicle sales in the United States. *Amicus curiae* "Plus" Dealers is a trade association, representing Maine's automobile dealers, all of whom are franchisees of one or more of Alliance's members. The legal relationship between Manufacturers and Dealers is defined in a Sales and Service Agreement (Agreement). When a new vehicle is sold in the United States, the Manufacturer issues a warranty of free labor and parts for certain repairs, re-

placements or adjustments during the term of the warranty. Under the Agreement, the Dealers are required to perform warranty work and the Manufacturers are required to reimburse the Dealers for parts used and labor performed.

By its nature, work performed by one party that the other must reimburse is a potential source of controversy. The Agreement typically contains extremely explicit rules to clarify reimbursement practices. In Ford's case, reimbursement levels are established by specific national reimbursement formulae both for parts and labor. Under the terms of the Ford Agreement, for example, the time component of labor is reimbursed based upon standard hours generated by Ford's own analysis of the time it should take to complete each specific repair, not the amount of time the Dealer says the repair actually took.

The Dealers have rankled at the Manufacturers' warranty reimbursement rates. They claim the reimbursement rates for warranty work are significantly below retail rates for non-warranty work. Viewing all repair work, both warranty and non-warranty, as a whole, the Dealers posit that they are required to make up the Manufacturers' stinginess by increasing prices for non-warranty work. As a consequence, the Dealers argue the Manufacturers are mandating that non-warranty customers, who pay retail rates, must subsidize the Manufacturers, who do not. To the argument that the Dealers are receiving reimbursement at rates they bargained for and agreed to, the Dealers point to the overpowering economic weight of the Manufacturers, which they claim forces them to accept parsimonious reim-

---

**3.** These members include: BMW Group, DaimlerChrysler, Ford Motor Co., General Motors, Mazda, Mitsubishi Motors, Nissan, Porsche, Toyota, and Volkswagen.

bursement rates.[4] By contrast, the Dealers argue retail customers for non-warranty work have no such leverage and end up paying what the Manufacturers will not. In response, the Manufacturers have used a mirror argument, pointing to the national market for automobiles and claiming that consumers outside Maine will be required to pay higher prices for warranty work to make up for the extra money the Manufacturers must reimburse Dealers in Maine.

The Dealers have successfully sought legislative intervention. In 1975, the State of Maine first began to regulate the price manufacturers must pay to Maine car dealers for repairs made under manufacturer warranty. Pub.L.1975 Ch. 573, § 1176. The statute contained the relatively benign provision that manufacturers must "adequately and fairly compensate each of its motor vehicle dealers for parts and labor." 10 M.R.S.A. § 1176 (1975). In 1979, the Maine Legislature acted again. This time it enacted a provision by which a dealer could collect attorney's fees in the event the dealer was successful in a legal action for a claim for warranty reimbursement the manufacturer had denied. Pub.L.1979, Ch. 498, § 3.

In 1980, the Maine Legislature repealed the 1975 statute and replaced it with a new provision that continued to require Manufacturers to "adequately and fairly compensate" the dealers for parts, but mandated they reimburse Dealers for any labor "at the retail rate customarily charged by that (dealer) for the same labor when not performed in satisfaction of a warranty." P.L.1975, Ch. 698, § 1. In 1991, the Legislature amended the statute to require parts reimbursement for warranty work to be made "at the retail rate customarily charged by that (dealer) for the same parts when not provided in satisfaction of a warranty." P.L.1991, Ch. 328. As of October 9, 1991, the effective date of the 1991 law, the Manufacturers were mandated as a matter of Maine statutory law to reimburse Maine Dealers for both parts and labor for warranty work at rates the Dealers charged non-warranty customers.

This did not sit well with the Manufacturers. One manufacturer, Ford, simply ignored the law and continued to reimburse its dealers at lower rates. In 1992, Darling's resorted to Small Claims Court to compel compliance with the reimbursement requirements of § 1176. The Small Claims Court dismissed the claim because Darling's had failed to submit an adequate claim for reimbursement to Ford. *Darling's Bangor Ford/VW/Audi*, 92–SC–229 (Me.Dist.Ct.3, S.Pen.) (Oct. 20, 1992).

On April 1, 1993, Ford announced a new policy. It agreed to reimburse its Maine Dealers at what amounted to retail rates, but at the same time, it stated that in order to recover this increase in costs, it would surcharge approximately $160 per

---

4. Judge Brody in *Acadia Motors,* 844 F.Supp. at 825 n. 7 quoted the following congressional statement on the manufacturer-dealer relationship:

[The] vast disparity in economic power and bargaining strength has enabled the manufacturer determine arbitrarily the rules by which the two parties conduct their business affairs. These rules are incorporated in the sales agreement or franchise which the manufacturer has prepared for the dealer's signature. Dealers are with few excep-

tions completely dependent on the manufacturer for their supply or cars. When the dealer has invested to the extent required to secure a franchise, he becomes in a real sense the economic captive: of his manufacturer .... The faults of the factory-dealer system are directly attributable to the superior market position of the manufacturer. ·

S. Rep. No.2073, 84th Cong., 2d Sess., 2 (1956).

vehicle, thereby increasing the wholesale price for each new Ford vehicle sold in Maine. This surcharge, termed a "warranty parity surcharge," appeared on each dealer's monthly parts invoice in the month following the sale. The surcharge was imposed based on the number of vehicles sold, without regard to whether the dealer actually performed warranty work in that month. The surcharge was imposed on Maine dealers only.

In 1993, the Dealers brought suit in this Court, claiming the surcharge violated Maine statutory law. *Acadia Motors*, 44 F.3d at 1055. The First Circuit ruled that § 1176 did not restrict the Manufacturers from recovering their compliance costs:

> Noting in the language of section 1176 prohibits a manufacturer from increasing vehicle prices in order to recover its increased compliance costs. The statute says nothing about wholesale or retail prices, and apparently leaves the manufacturer free to increase wholesale prices, and the dealer to increase retail prices.

*Id.* Despite its victory, Ford discontinued the surcharge and did not immediately re-impose it.

A brief period of quiescence followed the First Circuit opinion. It was not to last. Later in 1995, Darling's initiated suit against Ford, presenting a host of issues for judicial resolution. On April 1, 1998, Judge Hornby certified a series of questions of state law to the Maine Supreme Judicial Court pursuant to 4 M.R.S.A. § 57 and M.R.Civ.P. 76B. The Maine Law Court responded on October 28, 1998. *Darling's d/b/a Darling's Bangor Ford,* 1998 ME 232, 719 A.2d 111. The parties ultimately and uncharacteristically settled the dispute. *See Acadia Motors, Inc.,* 2002 ME 102, ¶ 7, 799 A.2d 1228.

In 1999, Ford informed the Dealers it would re-impose the warranty parity sur-

charge of $150 (later $250) for each vehicle sold or leased in Maine to recover the costs of compliance with § 1176 and the costs of the settlement it had incurred in the Darling suit. *Acadia,* 2002 ME 102, ¶ 7, 799 A.2d at 1230. The result was predictable. On August 10, 1999, a large number of individual Maine auto dealers filed suit in State Superior Court seeking a declaratory judgment that the surcharge violated § 1176. Again, the result was predictable. On June 25, 2002, the Maine Supreme Judicial Court agreed with the First Circuit Court of Appeals and ruled that the Maine statute "contains no language restricting or conditioning Ford's ability to recover its costs of compliance." *Id.* 2002 ME 102, ¶ 11, 799 A.2d at 1230.

The Dealers turned once more to the Maine Legislature and in 2003, the Legislature acted. The result is L.D. 1294 and the pending lawsuit. Section 10 of L.D. 1294 provides in part: "A [manufacturer] may not otherwise recover its costs for reimbursing a [dealer] for parts and labor pursuant to this section." This statutory provision appears to plug the hole in the law the First Circuit and the Maine Supreme Judicial Court determined existed in earlier versions. The Manufacturers have now turned to this Court for relief from the newly enacted Maine law.

## II. Discussion

This Court must apply a familiar four-part test to determine whether injunctive relief is appropriate: first, the likelihood of success on the merits; second, the potential for irreparable harm, if the injunction is denied; third, the balance of relevant impositions; and, four, the effect of the court's ruling on the public interest. *Ross–Simons of Warwick v. Baccarat,* 102 F.3d 12, 15 (1st Cir.1996), *accord Rosario–Urdaz v. Rivera–Hernandez,* 350 F.3d 219

(1st Cir.2003); *Narragansett Indian Tribe v. Guilbert,* 934 F.2d 4, 5 (1st Cir.1991).

## A. Likelihood of Success

Alliance's Motion for Preliminary Injunction is grounded on the assertion that Section 10 of L.D. 1294 is unconstitutional. Although the Complaint attacks both Section 10 and Section 12 of L.D. 1294, Alliance's Motion for Preliminary Injunction is directed only against Section 10. The Motion asks this Court to enjoin enforcement of Section 10 pending the final resolution of this lawsuit. The Complaint challenges the constitutionality of Section 10 on three grounds: (1) that it violates the Commerce Clause; (2) that it violates the Contracts Clause; and, (3) that it violates the Takings Clause.[5] The Court will limit its discussion to the Commerce and Contracts Clauses. In evaluating Alliance's claims of constitutional infirmity, this Court is required to presume the challenged act is constitutional. *Davies Warehouse Co. v. Bowles,* 321 U.S. 144, 153, 64 S.Ct. 474, 88 L.Ed. 635 (1944) ("State statutes, like federal ones, are entitled to the presumption of constitutionality until their invalidity is judicially declared.").

### 1. Commerce Clause

Under the United States Constitution, Article I, section 8, Congress has the power "to regulate commerce with foreign nations, and among the several states, and with the Indian tribes." U.S. Const. Art. I, section 8, cl. 3. In matters not governed by federal legislation, "the Clause has long been understood to have a 'negative' aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Oregon Waste Systems, Inc.*

*v. Department of Environmental Quality,* 511 U.S. 93, 98, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994); *Wyoming v. Oklahoma,* 502 U.S. 437, 454, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992); *Welton v. Missouri,* 91 U.S. 275, 23 L.Ed. 347 (1876). This "negative command, known as the dormant Commerce Clause, prohibits states from acting in a manner that burdens the flow of interstate commerce." *Pharm. Research & Mfrs. of Am. v. Concannon,* 249 F.3d 66, 79 (1st Cir.2001) (hereinafter *PhaRMA* ), *aff'd sub nom. Pharm. Research & Mfrs. Of Am. v. Walsh,* 538 U.S. 644, 123 S.Ct. 1855, 155 L.Ed.2d 889 (2003).

Alliance alleges that Section 10 of L.D. 1294 violates the Commerce Clause by "burdening interstate commerce through extraterritorial regulation of the wholesale prices of motor vehicles; purposefully discriminating against out-of-state manufacturers, motor vehicle dealers and consumers and favoring in-state motor vehicle dealers and consumers; and, by having a practical effect that imposes a heavier burden on out-of-state manufacturers, dealers and consumers than on in-state dealers and consumers." *Pl.'s Complaint* at 50.

### a. Extraterritorial Regulation

■ Alliance claims that Section 10's prohibition from recovering warranty costs extends beyond the boundaries of the State of Maine. It contends that under the "plain and ordinary meaning" of Section 10, the Alliance's members "cannot raise prices *in any state* for the purpose of recovering the costs of complying with Section 1176." *Pl.'s Mot. For Preliminary Injunction* at 13. Alliance asserts that its members could not require reimbursement of dealers in Michigan without

---

**5.** At oral argument, Alliance waived the Takings Clause claim for purposes of the Motion for Preliminary Injunction.

running afoul of Maine law. Having raised the spectre of "extraterritorial reach," Alliance urges this Court to conclude that the Section 10 is a per se violation of the Commerce Clause. *See PhaRMA,* 249 F.3d at 79.

Alliance's argument misses the mark. In construing the territorial reach of Section 10, this Court is obligated to apply "the elemental rule" that "every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *Hooper v. California,* 155 U.S. 648, 657, 15 S.Ct. 207, 39 L.Ed. 297 (1895). When faced with two possible constructions of a statute, one of which would raise "serious constitutional problems" while the other would not, the Court is required to construe the statute to avoid such problems. *Immigr. & Naturalization Serv. v. St. Cyr,* 533 U.S. 289, 299–300, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001).

Justice Cardozo, writing for the Supreme Court in *Baldwin v. G.A.F. Seelig, Inc.,* 294 U.S. 511, 521, 55 S.Ct. 497, 79 L.Ed. 1032 (1935) observed that "New York has no power to project its legislation into Vermont by regulating the price to be paid in that state for milk acquired there." Section 10, however, makes no such attempt. In concluding that the Maine Rx Program did not constitute impermissible extraterritorial regulation, the Supreme Court quoted the First Circuit with approval:

> the Maine Act does not regulate the price of any out-of-state transaction, either by its express terms or by its inevitable effect. Maine does not insist that manufacturers sell their drugs to a wholesaler for a certain price. Similarly, Maine is not tying the price of its in-state products to out-of-state prices.

*PhaRMA,* 123 S.Ct. at 1871.

Despite Alliance's vigorous arguments to the contrary, this Court does not interpret Section 10 of L.D. 1294 as attempting to reach outside Maine borders and restrict what the manufacturers reimburse dealers in other states. Section 10 does not "regulate the price of any out-of-state transaction, either by its express terms or inevitable effect." It does not insist that manufacturers set their warranty reimbursements outside of Maine at "a certain price." It does not attempt to tie the level of warranty reimbursement in Maine "to out-of-state prices." The Manufacturers' argument that what they lose from Maine dealers, they must collect from out-of-state dealers is bottomed on the fallacy that they have a constitutional right to a particular national rate of return from warranty repairs.

Moreover, in the Act itself, the Maine Legislature itself fully stated its legislative aim to address Maine transactions. *See PhaRMA,* 249 F.3d at 97 (concurrence). The Maine Legislature has declared in detail its intent in enacting regulations of business practices among motor vehicle manufacturers, distributors and dealers:

> The Legislature finds that the manufacture, distribution and sale of motor vehicles in the State vitally affects the general economy of the State and the public interest and public welfare; that the manufacturers of motor vehicles whose physical manufacturing facilities are not located within the State and distributors are doing business in the State through their control over and relationship and transactions with their dealers in the State; that the geographical location of the State makes it necessary to ensure the availability of motor vehicles and parts and dependable service for motor vehicles throughout the State to protect and preserve the transportation system, the public safety and welfare and the investments of its residents. The Legislature declares, on the basis of these

findings, that it is necessary to regulate and to license motor vehicle manufacturers and distributors and their branches and representatives, motor vehicle dealers and any other persons engaged in the business of selling or purchasing vehicles in the State in order to prevent frauds, impositions and other abuses against residents and to protect and preserve the economy, the investments of residents, the public safety, and the transportation system of the State.

10 M.R.S.A. § 1182. Although enacted in 1997 before the passage of L.D. 1294, this public policy statement is contained within the same subchapter and sets forth the Legislature's rationale for regulating the manufacturer-dealer relationship; Section 10 is part of this regulatory scheme. The Maine Legislature should be taken at its word that its manufacturer-dealer laws are intended to apply in Maine to Maine public policy issues. In the words of the First Circuit, "it cannot be proper for a federal court to make judicial 'findings' contrary to Maine's legislative declarations and on that basis declare that Maine's Act is invalid." *PhaRMA*, 249 F.3d at 97 (concurrence).

In short, this Court concludes that Section 10 is does not have an extraterritorial reach violative of the Commerce Clause of the United States Constitution.

### b. Discrimination Against Out–Of–State Commerce

■ Alliance next claims Section 10 constitutes a *per se* violation of the Commerce Clause, because it discriminates against interstate commerce and favors in-state economic interests over out-of-state interests. It alleges that Section 10's "purpose is to transfer wealth exclusively from out-of-state manufacturers, dealers and consumers to in-state dealers." *Pl.'s Mot.* at 17. This argument is unpersuasive. In reviewing whether a state statute violates the Commerce Clause, the first step is to determine whether it "regulates evenhandedly with only 'incidental' effects on interstate commerce, or discriminates against interstate commerce." *Oregon Waste Systems, Inc.*, 511 U.S. 93, 98, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994) (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 325–26, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979)); *Ford Motor Co. v. Texas Dept. of Transp.*, 264 F.3d 493, 499 (5th Cir.2001). A statute discriminates against interstate commerce when it provides for "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste*, 511 U.S. at 99, 114 S.Ct. 1345; *see also Ford Motor*, 264 F.3d at 499. If a state statute discriminates against interstate commerce, "strict scrutiny" is applied under a "virtually per se invalid rule." *PhaRMA*, 249 F.3d at 79.

The Commerce Clause does not invalidate all state regulation that has a disparate impact on out-of-state economic interests. Instead, it looks to whether in-state business entities are favored over similarly situation out-of-state entities. *Ford Motor*, 264 F.3d at 500. The case of *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978) is illustrative. In *Exxon*, a Maryland statute provided that a producer or refiner of petroleum products could not operate any retail gas station within the State and had to extend all "voluntary allowances" uniformly to all services stations it supplied. Exxon challenged the statute based in part on an asserted violation of the Commerce Clause. Justice Stevens made short work of Exxon's argument:

> Plainly, the Maryland statute does not discriminate against interstate goods, nor does it favor local producers and refiners. Since Maryland's entire gasoline supply flows in interstate commerce and since there are no local producers or

refiners, such claims of disparate treatment between interstate and local commerce would be meritless.

*Exxon,* 437 U.S. at 125, 98 S.Ct. 2207.

To posit the opposite example, in *Lewis v. BT Investment Managers, Inc.,* 447 U.S. 27, 100 S.Ct. 2009, 64 L.Ed.2d 702 (1980), the Supreme Court declared a Florida statute violative of the Commerce Clause because it favored Florida-based banks, bank holding companies, and trust companies over those same companies with principal operations outside of Florida. *Lewis,* 447 U.S. at 42, 100 S.Ct. 2009. The *Lewis* Court distinguished *Exxon:* "The Court [in Exxon] concluded that the statute could not discriminate against interstate petroleum producers and refiners in favor of locally based competitors because, as a matter of fact, there were no such local producers or refiners to be favored." *Lewis,* 447 U.S. at 40–41, 100 S.Ct. 2009.

This leads us back to *PhaRMA.* Judge Hornby easily dispatched the claim of in-state versus out-of-state discrimination:

> There are no Maine drug manufacturers, and no suggestion on this record that Maine is in the process of trying to establish a favorable environment to bring them here. Instead, the rebate program applies to any manufacturer, whether or not it is from Maine. Maine is trying to benefit its residents, specifically those who are uninsured, in the purchase of prescription medicines; but it is not trying to better their lot over out-of-staters. So the question is not whether Maine is discriminating against out-of-staters, but simply whether it has the power to extend its authority to out-of-state manufacturers.

*Pharm. Research & Mfg. of Am. v. Comm'r,* 2000 U.S. Dist. LEXIS 17363 *13 (hereinafter *PhaRMA* ). PhaRMA did not even raise this argument before the First Circuit. *PhaRMA,* 249 F.3d at 83 (noting

"Pharma does not contend, nor did the district court find, that the Maine Act discriminates on its face or in its effects. Therefore, we need not discuss it further."). The Supreme Court simply noted that the "Maine Rx Program will not impose a disparate burden on any competitors. A manufacturer could not avoid its rebate obligation by opening production facilities in Maine and would receive no special benefit to competitors of rebate-paying manufacturers." *PhaRMA,* 123 S.Ct. at 1871.

Applying these principles, Section 10 of L.D.1294 does not discriminate against out-of-state manufacturers, because as a matter of fact, there are no in-state manufacturers to be favored. *General Motors Corp. v. Tracy,* 519 U.S. 278, 299, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997) ("[I]n absence of actual or prospective competition between the supposedly favored and disfavored entities *in a single market* there can be no local preference, whether by express discrimination against interstate commerce or undue burden upon it, to which the dormant Commerce Clause may apply.") (emphasis added); *Alliance of Auto. Mfgrs. v. Kirkpatrick,* 2003 WL 21684464 at *8, 2003 U.S. Dist. LEXIS 12323 at *29 ("Recent Supreme Court precedent has strongly suggested that Commerce Clause claims of the kind at issue here [alleged protectionism] cannot jump across markets . . . .")

To the extent the "local benefit" or "subsidy" category of cases applies, the State urges the Court to conclude that the recoupment prohibition is "too far afield from . . . protectionism" to constitute a per se violation of the Commerce Clause. *Def.'s Mem.* at 13 (quoting *Fireside Nissan v. Fanning,* 30 F.3d 206, 217 (1st Cir.1994)). Based on the record before it, the Court agrees with the State that the degree of local benefit and its impact on

out-of-state businesses is speculative, at best.

### c. Pike v. Bruce Church

If the statute does not have an impermissible extraterritorial reach and does not discriminate against out-of-state commerce, then the third leg of the analysis is the balancing test under *Pike v. Bruce Church*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). At oral argument, counsel for Alliance stated that it is "not making a *Pike v. Bruce Church* argument" and therefore, the Court will not address this final Commerce Clause analytic framework.

### 2. Contracts Clause

■ Alliance asserts that Section 10 of L.D. 1294 violates the Contracts Clause of the United States Constitution. U.S. Const. Art I, section 10, cl. 1. The Contracts Clause provides: "No State shall ... pass any ... law impairing the Obligation of Contracts." *Id.* As the Supreme Court has explained, although the language of the Contract Clause "is facially absolute, its prohibition must be accommodated to the inherent police power of the State 'to safeguard the vital interests of its people.'" *Energy Reserves Group v. Kan. Power & Light Co.*, 459 U.S. 400, 410, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983) (quoting *Home Bldg. & Loan Assn. v. Blaisdell*, 290 U.S. 398, 434, 54 S.Ct. 231, 78 L.Ed. 413 (1934)).

This is not the first time this Court has visited this issue. In 1994, Judge Brody addressed a Contract Clause allegation in the warranty reimbursement context and in 1998, Judge Hornby ruled that Judge Brody's decision was "the final decision for purposes of collateral estoppel." *Acadia Motors*, 844 F.Supp. at 823–28; *Darling's v. Ford*, Civil No. 95–398–B–H at 7. As Ford Motor Company was pressing the issue in the *Acadia Motors* and *Darling's* cases and is not a party to the instant action, this Court cannot give Judge Brody's 1994 decision preclusive effect. *Dennis v. R.I. Hosp. Trust Nat'l Bank*, 744 F.2d 893, 899 (1st. Cir.1984). Nevertheless, Judge Brody's reasoning is persuasive.

The first step in a Contracts Clause analysis is whether the Legislature intended the law to apply to pre-existing contracts. Neither party has asserted that L.D. 1294 has only prospective application and this is consistent with Judge Brody's determination in 1994 that the 1991 amendments to the warranty reimbursement statute were to be applied to warranty work performed after the effective date of the statute "regardless of when the underlying franchise agreement was executed." *Acadia Motors*, 844 F.Supp. at 826. This Court accepts the implicit view that the provisions of Section 10 of L.D. 1294 apply to warranty work performed from September 13, 2003 onward, regardless of when the franchise agreement was entered into.

■ Once the Court determines that a newly enacted statute affects a pre-existing contract, the Court must analyze "whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." *Allied Structural Steel Co., v. Spannaus*, 438 U.S. 234, 244, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978). Alliance points to the provision in the standard Agreement that reserves to the Manufacturer the right to price its vehicles. *Ford Sales and Service Agreement Standard Provisions*, para. 1.(f)("DEALER PRICE" shall mean, with respect to each COMPANY PRODUCT to which it refers, the price to the Dealer for such product, *as from time to time established by the Company ...* ) & para. 10 ("The Company has the right at any time and from time to

time to change or eliminate prices, charges, discounts, allowances, rebates, refunds or other terms of sale affecting COMPANY PRODUCTS ...").  Alliance argues that the impairment from pricing in Section 10 is substantial, because it limits its members' "pre-existing contractual right to price products that forms the foundation of a motor vehicle manufacturer's business strategy." *Def.'s Mem.* at 20.

The law requires more.  To determine "substantial impairment," the statute must be analyzed in terms of whether the industry has been regulated in the past. *Energy Reserves Group,* 459 U.S. at 411, 103 S.Ct. 697; *Allied Structural Steel Co.,* 438 U.S. at 242, n. 13, 98 S.Ct. 2716 (citing *Veix v. Sixth Ward Bldg. & Loan Assn.,* 310 U.S. 32, 38, 60 S.Ct. 792, 84 L.Ed. 1061 (1940)) (stating "[w]hen he purchased into an enterprise already regulated in the particular to which he now objects, he purchased subject to further legislation upon the same topic.")  In the words of Justice Holmes, "One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them." *Hudson County Water Co. v. McCarter,* 209 U.S. 349, 357, 28 S.Ct. 529, 52 L.Ed. 828 (1908).  Under this analysis, in the words of the First Circuit, the courts "look long and hard at the reasonable expectations of the parties." *Houlton Citizens' Coalition v. Town of Houlton,* 175 F.3d 178, 190 (1st Cir.1999).  It is to this end, the courts will examine "whether the parties operated in a regulated industry." *Id.*

Alliance cannot gainsay Judge Gene Carter's 1984 determination that since 1975 Maine has adopted "an extensive system of regulation of business practices between motor vehicle manufacturers, distributors, and dealers." *N.A. Burkitt, Inc. v. J.I. Case Co.,* 597 F.Supp. 1086, 1091 (D.C.Me.1984).  As part of this system of

regulation, the warranty reimbursement area has been the subject of steadily increasing State restriction ever since then.  In light of the extensive history, both legislative and judicial, this Court views with utmost skepticism Alliance's claim that the Section 10's prohibition against surcharges was "not foreseeable." *Def.'s Mem.* at 20.  Indeed, once it was judicially clarified that the Manufacturers could collect back their enhanced reimbursement costs by surcharging Maine vehicles, it was virtually inevitable this hole would be statutorily plugged.

In its Memorandum, Alliance cites the case of *Chrysler Corp. v. Kolosso Auto Sales, Inc.,* 148 F.3d 892, 895 (7th cir.1998) for the proposition that a "history of regulation is never a sufficient condition for rejecting a challenge based on the [C]ontracts [C]lause," because to find otherwise would permit a state to "decide to change the price in [the motor vehicle manufacturer's] contracts."  But, in *Kolosso,* the Seventh Circuit affirmed a district court ruling that enforced new Wisconsin legislation allowing a dealer to challenge a manufacturer's refusal to permit relocation of a dealership and overriding a specific provision to the contrary in the franchise contract.  Chief Judge Posner wrote "a contractual obligation is not impaired within the meaning that the modern cases impress upon the Constitution if at the time the contract was made the parties should have foreseen the new regulation challenged under the clause." *Chrysler,* 148 F.3d at 897.  Since 1975, the state of Maine has required the Manufacturers to reimburse warranty claims at adequate and fair rates.  From that time on, it was, in this Court's view, reasonable for the Manufacturers to expect that the Legislature would continue to regulate this part of the Manufacturer–Dealer relationship until this overall legislative goal was inescapable.

In his 1994 opinion, Judge Brody concluded that the 1991 statutory changes were within reasonable expectations, "at least as to those contracts entered into after 1975." *Acadia Motors,* 844 F.Supp. at 827. Although Alliance has submitted evidence of model franchise agreements, there is no evidence from which this Court can conclude that any of the agreements pre-dated 1975.[6] Further, the Ford contracts, which Alliance counsel stated were representative, anticipate regulatory change, a factor the Supreme Court found significant in *Energy Reserves.*[7] 459 U.S. at 416, 103 S.Ct. 697 (stating "[m]oreover, the contracts expressly recognize the existence of extensive regulation by providing that any contractual terms are subject to relevant present and future state and federal law."). In sum, this Court concludes that Alliance's reasonable expectations have not been substantially impaired by the enactment of Section 10 of L.D. 1294. *Accord Acadia Motors,* 844 F.Supp. at 827.

Having found that the impairment of Section 10 was within the reasonable expectations of the parties, the Court need not to go further and examine whether the impairment "rests on, and is prompted by, significant and legitimate state interests." *Energy Reserves,* 459 U.S. at 416, 103 S.Ct. 697. However, the Court notes, in passing, that Judge Brody's opinion on this issue in 1994 is exactly applicable to the issue before the Court today. *Acadia Motors,* 844 F.Supp. at 827–28. Although the Manufacturers see the issue as mandating higher prices for out-of-staters, the Legislature is not compelled to view the policy question as the Manufacturers propose it. Instead, as Judge Brody concluded, the Maine Legislature is entitled to make a policy decision to respond to what it perceives as the disparity in bargaining power between Manufacturers and Dealers and to prevent Manufacturers, who have been "unwilling to pay the fair and full price for repairs made necessary when their automobiles failed to meet warranty stands," to force Dealers to shift costs of performing warranty work to nonwarranty customers. *Id.* at 828. This time dealing with Section 10 of L.D. 1294, this Court agrees with Judge Brody that the "Legislature's con-

6. Following oral argument at which the State had pointed out that none of the original Agreements had been produced, Alliance move to supplement its declarations to provide further information about the franchise Agreements. The Court granted Alliance's motion over the objections of the Defendants and *Amicus Curias* "Plus." Alliance submitted specimen policies from three manufacturers, DaimlerChrysler, General Motors, and Ford through the Affidavits of Jane F. Steinmetz, William T. Hepburn, Jr., and Matt Falerios. There is no indication in any of the Affidavits that any of the current Maine Dealer Agreements pre-dated the Maine legislation in 1975.

7. For example, the Ford documents contain references to the parties' understanding that the Agreement is subject to applicable law and the law may change during its term. The Ford Warranty & Policy Manual states that "No policy or procedure contained in the Warranty and Policy Manual is intended to be inconsistent with, or contrary to the Sales and Service Agreement *or state law."* The Ford Sales and Service Agreement provides that "Both parties recognize the rights of the Dealer and the Company under this agreement are defined and limited by the terms of this agreement *and applicable law."* In its Standard Provisions, Ford retains "the right to amend, modify or change this agreement in case of *legislation, government regulation or changes in circumstances beyond the control of the Company that might affect materially the relationship between the Company and the Dealer."* The Ford Standard Conditions mandate that the Dealer comply with "all applicable federal, state, and local law, rules and regulations in the ordering, sale and service of COMPANY PRODUCTS ..., including without limitation those related to ... customer service." There is no similar provision applicable to Ford.

cern for protection of dealers and the public is a significant and legitimate public purpose" and that the means chosen by the Legislature to implement these purposes is also reasonable." *Id.*

### B. Irreparable Harm

■ Finally, in the Court's view, Alliance's motion also clearly stumbles on the irreparable harm requirement. The First Circuit has interpreted Civil Rule 65(a) as placing the burden squarely on the movant to demonstrate that a denial of interim injunctive relief would cause irreparable injury. *Ross–Simons,* 102 F.3d at 18. To be entitled to injunctive relief, the movant must demonstrate the inadequacy of legal remedies. *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982); *Ross–Simons,* 102 F.3d at 18–19; *Lopez v. Garriga,* 917 F.2d 63, 68 (1st Cir.1990). To the contrary, Alliance has unequivocally demonstrated it has a vehicle for recoupment of monies its members will have lost if the statute is deemed unconstitutional. Its own member Ford Motor Company has successfully garnered $3.6 million from Maine dealers in the year 2002 alone by surcharging its dealers. Alliance has failed to demonstrate that this remedy would be unavailable to its members in this case.

Alliance argued it would be "unfair" if its members were to charge new car purchasers to make up for the loss of past surcharges. However, in the early 1990s, when Ford imposed the $160 surcharge on each new vehicle sold in Maine to recollect the higher warranty reimbursement mandated by Maine law, Ford simply assessed its surcharge on each Dealer's parts invoice in the month following the sale. It did so "without regard to whether the dealer actually performed warranty work in that month." *Acadia Motors,* 44 F.3d at 1052–53. The Dealers' claim that in some instances they paid more in surcharges than they received in increased reimbursement under the new policy did not impress Ford at the time. *Id.* at 1053 n. 6. Ford simply responded that the $160 figure was "calculated to recoup Ford's increased costs of doing business over time, spreading those costs evenly among the dealers." *Id.*

Having determined that Alliance has not met its burdens of establishing a likelihood of success on the merits and irreparable injury, the Court does not need to address the remaining tests under *Ross–Simons.*

### III. Conclusion

The Alliance of Automobile Manufacturers' Motion for Preliminary Injunction is DENIED for the reasons set forth above.